Catherine TROST–STEFFEN,
Appellant–Petitioner,

v.

Kenneth L. STEFFEN, Appellee–
Respondent.

No. 61A05–0110–CV–441.

Court of Appeals of Indiana.

July 30, 2002.

Rehearing Denied Sept. 17, 2002.

502

Russell T. Clarke, Jr., Emswiller, Williams, Noland & Clarke, Indianapolis, IN, Attorney for Appellant.

Samuel A. Swaim, Hanner Hanner & Hanner, Rockville, IN, Attorney for Appellee.

## OPINION

KIRSCH, Judge.

Catherine Trost–Steffen (Mother) appeals the trial court's order that dissolved her marriage to Kenneth L. Steffen (Father). She raises the following four restated issues:

I. Whether the trial court's property distribution, which awarded 85% of the net estate to Mother and 15% to Father, was erroneous because such distribution awarded only 24% of the jointly held property to Mother.

II. Whether the trial court properly valued stock in a closely-held corporation primarily owned and operated by Mother's family.

III. Whether the trial court properly awarded custody of the parties' minor children to Father.

IV. Whether the trial court erred when it imposed sanctions against Mother for noncompliance with discovery.

We affirm.

### FACTS AND PROCEDURAL HISTORY

Mother and Father married in 1979 and separated in July 1999, when Mother filed her petition for dissolution of marriage. They are the parents of three children, B.S., A.S., and F.S. Both parties are well educated: Mother has a Masters' degree in speech and language pathology, and Father has a Ph.D. in horticulture.

The parties moved a number of times in pursuit of Father's education and career. After Father received his Bachelor's degree in 1979 from the University of Illinois, Mother and Father moved to Maryland where Father obtained his Master's degree. During this time, Mother worked at the Maryland School for the Deaf. After B.S. was born in 1982, they moved to Madison, Wisconsin, where Father entered the Ph.D. program at the University of Wisconsin. While there, A.S. and F.S. were born, and, for three years, Mother worked part-time as a research assistant for a speech pathology professor. In 1987, the parties relocated to the University of Kentucky, where Father engaged in postdoctorate work, and Mother began homeschooling the oldest child, B.S. In 1989, the family moved to Pennsylvania, where Father was an assistant professor at Penn

State University. They remained in Pennsylvania for approximately seven years. During that time, Mother did not work outside the home, but homeschooled the children. Father was denied tenure in 1995, and, in 1996, the family moved to Parke County, Indiana, and began an organic farming operation, Quiet Springs Farm. Mother continued homeschooling the children, who "did very well." *Appellant's Appendix* at 70.

Each party brought to the marriage substantial financial resources. Additionally, during the marriage, Mother inherited or was gifted significant assets from her family. Her father began, and her family continues to own and operate, a business called CJT, Inc./Koolcarb ("CJT"), of which Mother is a director and receives annual director's fees in the amount of $2,400. In 1982 or 1983, Mother was gifted 3,804 shares of CJT; those remained in her name alone and were never commingled with joint assets. As of the date of separation, the parties jointly owned an additional 400 shares of CJT. The CJT stock generates annual dividends of approximately $32,000. In 1996, Mother received a $100,000 distribution from a trust established by her father, who died in 1992. That distribution was applied toward the purchase of the parties' Parke County home. Beginning in 1994, Mother also received annual gifts of $10,000, which were used to purchase marital assets and fund the family's expenses.

Following a physical altercation between the parties in June 1999, and after almost twenty years of marriage, Mother filed her petition for dissolution on July 2, 1999. Among other things, she requested temporary custody of the children, supervised visitation for Father, and possession of the marital residence. She also sought and obtained a temporary restraining order against Father. Shortly thereafter, Father filed a cross-petition for dissolution, in which he asked for emergency custody of the children. Upon Mother's request, the trial court conducted an in-camera interview of the children at the July 29, 1999 preliminary hearing. Following the hearing, the court awarded Father temporary custody of the children and possession of the marital residence and divided certain personal property and debts. Following this custody determination, the children were placed in public schools, and each of the children continued to excel academically. In September 1999, Dr. Richard Lawlor performed a custodial evaluation; he ultimately recommended that Father retain custody of the minor children.

During the pendency of the action, contentious discovery disputes arose concerning matters Father sought to discover regarding CJT, its stock ownership and restrictions on transfer, and the trust from which Mother had received the $100,000 distribution. Upon Father's motion to compel, the court ordered Mother to produce the requested information.

Pursuant to Father's request, the trial court issued findings of fact and conclusions of law dissolving the marriage. In its order, the trial court imposed sanctions against Mother for noncompliance with discovery, awarding Father fees. It also divided the marital estate, and in so doing valued the CJT stock, all of which the court awarded to Mother. Its division of property resulted in Mother receiving 85% of the net marital estate and Father receiving 15%. The court awarded custody of the minor children to Father. Mother now appeals, and Father requests appellate fees.

## DISCUSSION AND DECISION

### I. *Distribution of the Marital Estate*

 The division of marital assets lies within the sound discretion of the trial

court. *Wells v. Collins,* 679 N.E.2d 915, 916 (Ind.Ct.App.1997). "An abuse of discretion occurs if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom." *Id.* As a reviewing court, we may not reweigh the evidence or assess the credibility of witnesses, and we consider only the evidence most favorable to the trial court's disposition of marital property. *Marriage of Stetler,* 657 N.E.2d 395, 398 (Ind.Ct. App.1995), *trans. denied* (1996); *see also Goodman v. Goodman,* 754 N.E.2d 595, 599 (Ind.Ct.App.2001) (reviewing division of property for abuse of discretion, we consider only evidence favorable to judgment). In addition, the party challenging the trial court's property division must overcome a strong presumption that the court considered and complied with the appropriate statutory guidelines. *Wells,* 679 N.E.2d at 916.

 As stated earlier, the trial court made specific findings of fact and conclusions of law at Father's request pursuant to Ind. Trial Rule 52(A). Our standard of review is therefore two-tiered; we first determine whether the evidence supports the findings of fact and then whether those findings support the judgment. *Goodman,* 754 N.E.2d at 599. On review, we do not set aside the trial court's findings or judgment unless clearly erroneous. T.R. 52(A). A finding is clearly erroneous when the record lacks any evidence or reasonable inferences from the evidence to support it. *Bloodgood v. Bloodgood,* 679 N.E.2d 953, 956 (Ind.Ct.App.1997). The judgment will be reversed only when clearly erroneous, i.e., when the judgment is unsupported by the findings of fact and conclusions entered on the findings. *Id.*

Here, Mother's quarrel with the division of the marital estate is that she received only 24% of the jointly acquired property, despite making contributions of 45% to the acquisition of such property through supplying her gifts and inheritances to the family's maintenance and expenses, serving as homemaker, and successfully homeschooling the children. Specifically, Mother asserts that because of her significant financial and non-financial contributions, she should have received "an equal portion of the jointly acquired property[.]" *Appellant's Brief* at 17.

An equal division of marital property between the parties is presumed to be just and reasonable. IC 31–15–7–5. However, the presumption that an equal division of marital property would be just and reasonable

may be rebutted by a party who presents relevant evidence, including evidence concerning the following factors, that an equal division would not be just and reasonable:

(1) The contribution of each spouse to the acquisition of the property, regardless of whether the contribution was income producing.

(2) The extent to which the property was acquired by each spouse:

 (A) before the marriage; or

 (B) through inheritance or gift.

(3) The economic circumstances of each spouse at the time the disposition of the property is to become effective, including the desirability of awarding the family residence or the right to dwell in the family residence for such periods as the court considers just to the spouse having custody of any children.

(4) The conduct of the parties during the marriage as related to the disposition or dissipation of their property.

(5) The earnings or earning ability of the parties as related to:

 (A) a final division of property; and

(B) a final determination of the property rights of the parties.

IC 31–15–7–5.

■ In this case, the court deviated from the presumption and made an unequal division of the estate, awarding Mother approximately 85% of the net estate. In making its division, the court awarded to Mother all the CJT stock, namely 4204 shares (3804 in her name and all 400 joint shares), with a total value of $1,017,368.[1] Mother concedes that the stock in her individual name should be awarded to her, *Appellant's Brief* at 10, but argues that all joint property should be divided equally. To the extent that Mother's position suggests that any of her inheritances and gifts should be excluded from the marital estate,[2] it ignores IC 31–15–7–4(a), which provides that in an action for dissolution of marriage, the trial court shall divide the property of the parties, regardless of whether it was:

(1) owned by either spouse before the marriage;

(2) acquired by either spouse in his or her own right:

(A) after the marriage; and

(B) before final separation of the parties; or

(3) acquired by their joint efforts.

*See also Fobar v. Vonderahe,* 771 N.E.2d 57, 60 (Ind.2002) (in affirming trial court's essentially equal property division, supreme court observed inclusion of wife's inherited real estate in marital pot); *Wells,* 679 N.E.2d at 921 (in affirming trial court's finding that wife had successfully rebutted presumption of equal distribution of property, this court observed that trial court properly included wife's inheritances in marital pot).

After the court assembles the assets and liabilities of the marital pot, it determines the appropriate division of the estate and considers, among other things, the manner of acquisition and whether an unequal division would be just and reasonable based on the facts and circumstances of that case. Here, the court deviated from the presumptive 50/50 split in order to compensate Mother for the significant contributions that she made to the marriage. It awarded her all the CJT stock in her name, as well as the 400 shares of jointly held CJT stock. We do not dispute that most of that which Father received in the distribution is comprised of jointly acquired property, while Mother received considerably less in joint property; indeed, the largest asset in the marriage was the CJT stock, awarded in total to Mother. The relevant inquiry is whether that result was against the logic and effect of the facts and circumstances before the court, including the reasonable inferences to be drawn therefrom. We conclude that it was not and, instead, hold that the result fell within the wide latitude of trial court discretion. This is not to say, however, that a court

1. The court valued the stock at $242 per share, a value that Mother contests as too high. This valuation is discussed in the following section of this opinion.

2. For instance, the trial court included the trust in the marital estate at a value of $100,000, and Mother argues, "The inclusion of the trust in the marital estate was error." *Appellant's Brief* at 17. Although Mother testified that she did not know the value of the trust, she previously averred in interrogatory answers that the value of the trust was $100,000. The trial court was thus presented with conflicting evidence on the value of the trust. Mother likewise presented conflicting evidence on whether her interest in the trust was vested. *Appellee's Appendix* at 42, 55, 68; *see also Appellant's Brief* at 7. We will not reweigh the evidence, but will consider only that favorable to the judgment. *Goodman,* 754 N.E.2d at 599.

faced with similar facts could not have reached a different conclusion.

For instance, in *Bloodgood*, the trial court equally divided a marital estate, which included substantial gifts and inheritances to husband during the marriage. In affirming the trial court, this court noted that even though evidence existed to support a determination different than the one reached by the trial court, the determination reached by the trial court was not clearly against the logic and effect of the facts and inferences before it. 679 N.E.2d at 956. *See also Fobar*, 771 N.E.2d at 60 (trial court was within its discretion in equally dividing property and was not required to alter such division to reflect wife's interest in inherited real estate).

In *Wallace v. Wallace*, 714 N.E.2d 774 (Ind.Ct.App.1999), *trans. denied* (2000), the trial court awarded 86% of the marital estate to husband. In reversing this property division, this court inferred that the trial court had "systematically excluded" from the marital pot gifts and inheritances that husband had received during the marriage. 714 N.E.2d at 781. We respectfully disagree with the *Wallace* majority that the trial court improperly excluded the gifts and inheritances from the marital estate. Rather, we agree with Judge Bailey's dissent. After acknowledging the strict standard of review we employ with respect to a dissolution court's division of property, Judge Bailey observed that the trial court expressly included the property acquired by gift or inheritance in its valuation of the net marital estate, and thus "[q]uite simply, ... did not exclude property from the marital pot." *Wallace*, 714 N.E.2d at 782. Rather, the trial court found that an equal distribution had been rebutted and awarded husband assets he had received through gift or inheritance. *Id.* Judge Bailey concluded that, while the facts and circumstances would have supported a distribution more favorable to wife, this court may not substitute its judgment for that of the divorce court. *Id.*

Nor will we substitute our judgment for that of the trial court in the present case, where the court included the gifts and inheritances in the marital estate, but determined that an award to Mother of all the CJT stock was just and reasonable, resulting in an unequal division of the estate.[3] We find no error in this determination.

We also observe that the trial court properly considered the factors of IC 31–15–7–5, expressly finding that Mother's financial status (economic circumstances) was "far superior" to Father's financial status, that Father was the "main contributor" to the building of the farm business, and that both parties are well educated, from which we can infer that both parties have earning capacity. *See Appellant's Appendix* at 21, 24. We find that under the facts of this case, the trial court properly considered the factors in IC 31–15–7–5 and arrived at a just and equitable property division.

---

**3.** Although Mother now proposes that the trial court should have awarded half, or 200 shares, of the joint CJT stock to Father, we note that at trial Mother proposed that all the shares of CJT be awarded to her. *Appellee's Appendix* at 80; *Petitioner's Exhibit 8.* Furthermore, Father testified that he did not know the transferability of the stock, and he did not desire those shares. *Appellee's Appendix* at 164–65; *Appellant's Appendix* at 132–33. We additionally observe that (1) the stock in question was in a "privately held family corporation," *Transcript* at 79, owned and operated by the family of his wife, with whom he was in the midst of a contentious divorce, and (2) he had engaged in a heated and prolonged discovery dispute with CJT over discovery of matters including stock ownership and company value. The court's solution to award all the CJT stock to Mother was both appropriate and sensible under the facts and circumstances of this case.

## II. Valuation of CJT Stock

Initially, we note that the standard for reviewing the trial court's valuation of property is the same standard for reviewing the court's division of property. That is, the trial court has broad discretion in ascertaining the value of property in a dissolution action, and it has not abused its discretion if its decision is supported by sufficient evidence and reasonable inferences therefrom. *Sanjari v. Sanjari,* 755 N.E.2d 1186, 1191 (Ind.Ct.App.2001).

On appeal, Mother asserts that the trial court's value of the CJT stock was erroneously high. In valuing the stock, the trial court adopted the opinion of Jeffrey Fisher, C.P.A., a witness who Father hired to value CJT and its stock. Utilizing the capitalized earnings method, Fisher arrived at a fair market value as of July 2, 1999 (the date of filing of the petition) of $346.83 per share, less thirty percent for minority interest discount and marketability discount, resulting in a value of $242.78 per share. Mother "acknowledges Fisher's testimony is sufficient to support the trial court's findings," but argues that we should nevertheless "be left with a firm conviction that a mistake has been made regarding the valuation of this stock." *Appellant's Brief* at 21. Mother's claim of mistake is based upon, at most, conflicting evidence as to value.

Here, Fisher testified as to the stock's fair market value. Mother did not call as witnesses any CJT officials or other experts to testify as to the stock's value, but did cross-examine Fisher as to his valuation, questioning the information upon which he relied to reach his conclusion. Specifically, her counsel posed hypothetical questions to Fisher. One inquired whether Fisher would change his opinion of value if he knew that on at least two prior occasions, April 1999 and December 1999, CJT stock had been sold back to the corporation at $118.62 and $140.79, respectively. Fisher responded that it possibly could have had an effect. *Transcript* at 252–53. A second hypothetical question inquired whether it might change Fisher's opinion if he was advised that "the company is the only ... entity that's ever bought any stock," Fisher replied, "Probably not." *Id.* at 254.

Additionally, during the earlier testimony of Mother, an August 8, 2000 letter from the secretary of CJT, Lawrence Trost, was admitted and stated that the company maintained a program under which shareholders could tender shares to CJT for redemption. *Appellant's Appendix* at 91, 135. Trost's letter stated that the redemption value for CJT stock for the period of October 1, 1999, to September 29, 2000, was $146.57 per share, which, on appeal, Mother suggests was the appropriate price at which to value the stock.

Initially, we observe that at trial Mother did not ask for the court to value the stock at $146.57 per share. Rather, she requested the court to value it at CJT's book value of $135.00 per share. *Id.* at 23, *Appellee's Appendix* at 80. Further, contrary to Mother's suggestion, the $146.57 redemption value does not represent fair market value; rather, the redemption value was based on the stock's book value. *Appellant's Appendix* at 135. As explained by Fisher, book value is a company's assets minus its liabilities, whereas fair market value is normally "over and above book value and represents ... realizable value or actually true value of a company" and takes into consideration a corporation's current and future earnings. *Transcript* at 230.

Considering the evidence in a light most favorable to the judgment, as we must do, we conclude that the court's valuation was not against the logic and effect of the

circumstances before it, and no abuse of discretion occurred.

### III. Custody Determination

 Mother asserts that the trial court erred in awarding custody of the minor children to Father.[4] Initially, we observe that, in custody disputes, "the trial court is often called upon to make Solomon-like decisions in complex and sensitive matters." *Speaker v. Speaker*, 759 N.E.2d 1174, 1179 (Ind.Ct.App.2001) (citing *Sebastian v. Sebastian*, 524 N.E.2d 29 (Ind.Ct. App.1988)). The trial court is in a position to see the parties, observe their conduct and demeanor, and hear their testimony; therefore, its decision receives considerable deference in an appellate court. *Id.* On review, we cannot reweigh the evidence, judge the credibility of the witnesses, or substitute our judgment for that of the trial court. *Id.* (citing *Clark v. Clark*, 726 N.E.2d 854 (Ind.Ct.App.2000), *trans. denied*). We will not reverse the trial court's custody determination unless it is clearly against the logic and effect of the facts and circumstances before the court or the reasonable inferences drawn therefrom. *Speaker*, 759 N.E.2d at 1179.

In making its custody determination, the following guides a trial court:

The court shall determine custody and enter a custody order in accordance with the best interests of the child. In determining the best interests of the child, there is no presumption favoring either parent. The court shall consider all relevant factors, including the following:

(1) The age and sex of the child.

(2) The wishes of the child's parent or parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

 (A) the child's parent or parents;

 (B) the child's sibling; and

 (C) any other person who may significantly affect the child's best interests.

(5) The child's adjustment to the child's:

 (A) home;

 (B) school; and

 (C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 8.5(b) of this chapter.

IC 31–17–2–8.

Here, Mother's challenge to the custody award is essentially three-pronged. First, Mother claims the trial court failed to adequately consider evidence of a pattern of domestic violence as required by IC 31–17–2–8(7). Second, she asserts as prejudicial and erroneous the trial court's findings that her act of removing herself and the children to an abuse shelter and her preliminary request that Father be required to exercise supervised visitation were unnecessary. Third, Mother argues that the trial court improperly considered Father's temporary custody of the children when making its final custody determination. *Appellant's Brief* at 23. We address each argument in turn.

In Finding 59 the court stated "That Cathy's belief that Ken was and is abusive is simply unfounded by the evidence." *Appellant's Appendix* at 26. In arguing

---

**4.** The parties agreed that the oldest child, now in college, be declared emancipated.

that the trial court overlooked a pattern of abuse, Mother identifies three episodes of physical altercation that occurred between the parties. In the most recent, and that which resulted in Mother vacating the residence and filing for dissolution, the parties argued about ownership and possession of a pair of scissors; Father admitted to pushing Mother, which caused her to stumble and fall over a table. In another, Father stated that he firmly herded Mother out of a room during the course of an argument. In the last, to which Father did not admit, Mother testified that she received bruises as a result of Father pushing her. Whether the cited incidents of physical contact constitute a "pattern" of domestic violence is debatable. However, the trial court heard the evidence, viewed the witnesses, namely Mother and Father, judged their credibility, and concluded that Mother's claims of abuse were unfounded. We discern no abuse of discretion on the part of the trial court, but rather a permissible credibility determination. *See Wiggins v. Davis*, 737 N.E.2d 437, 440 (Ind.Ct.App.2000) (party may not base her claim of abuse of discretion on trial court's failure to accept her version of facts).

Next, Mother asserts that the trial court committed prejudicial error in Findings 60 and 61, which stated:

60. That when the parties initially separated, Cathy took the children to an abuse shelter and kept them from Ken for approximately three weeks. This was unnecessary and was not conducive to good parent-child relationships.

61. That Cathy requested Ken be ordered to have supervised visitation during the preliminary hearing. This was also unnecessary, and not conducive to good parent-child relationships.

*Appellant's Appendix* at 26. Mother asserts that "if a party believes that they are subject to domestic violence and remove [sic] themselves and their children from such a situation, it is a sign of good parenting, and not to the contrary." *Appellant's Brief* at 26. Mother refers this court to a number of domestic abuse studies and statistics, at least one of which suggests that children face an increased risk of abuse in homes in which partner abuse occurs. *Id.* at 25–26. Certainly, as a general matter, it is better to err on the side of safety especially when protecting oneself and one's children from the hands of an abuser. However, we are not persuaded that the court erred in its findings.

As previously stated, the trial court judged the credibility of Mother and Father on the abuse issue and determined that Mother's claims were unfounded. Thus, Mother's act of taking the children to a shelter and keeping them from Father for approximately three weeks was viewed as "not conducive to good parent-child relationships." *Appellant's Appendix* at 26. Likewise, in light of the finding that the allegations of abuse were unfounded, Mother's request for supervised visitation at the preliminary hearing was viewed as merely a tactic to limit Father's association with the children and "not conducive to good parent-child relationships." *Id.* We discern no error in the trial court's findings on these matters. Further, even if we were to agree with Mother that the court's findings were erroneous, we do not agree that they prejudiced her as claimed, in light of the remaining evidence supporting the trial court's custody award to Father, including the evaluation and report of Dr. Richard Lawlor.

Dr. Lawlor's custodial evaluation was consistent with the trial court's determination that Mother's abuse allegations were unfounded and its ultimate award of custody to Father. Although we acknowledge that the fact-finder is not required to

accept opinions of experts regarding custody, it certainly may consider such evidence. *See Clark v. Madden,* 725 N.E.2d 100, 109 (Ind.Ct.App.2000) (noting that fact-finder is not required to accept opinions of experts regarding custody). Here, Dr. Lawlor's report compiled interviews with the parties individually, interviews with the children individually, and interviews with the children and each parent. It also reported results of psychological testing, which revealed that Mother evidenced elevated levels of "suspiciousness," "need for dominance and control," and "overcontrol of hostility." *Appellant's Appendix* at 175. Dr. Lawlor reported that although Mother and Father had engaged in "inappropriate shoving and pushing matches," he did not find evidence of a pattern of abuse. *Id.* at 176. He ultimately concluded that Father was more capable of being supportive of the children's contact and involvement with the other parent and recommended that custody remain the same, i.e., Father retain permanent physical and legal custody of the minor children. We further note that, although Mother testified that she felt Father was an abusive person, she denied that Father was unfit to have custody because of abuse. *Appellee's Appendix* at 89. To the extent Mother now asks that we reweigh the evidence before the trial court, we decline to do so. We find no error in the challenged findings.

Lastly, we address Mother's assertion that the trial court, in making its final custody determination, impermissibly considered Father's temporary custody of the children. Specifically, she challenges Finding 53, in which the trial court stated, "That by all accounts all three children are excellent kids and have thrived while in Ken's custody." *Appellant's Appendix* at 25. Mother maintains that this finding violates IC 31–15–4–13, which provides "[t]he issuance of a provisional order is

without prejudice to the rights of the parties or the child as adjudicated at the final hearing in the proceeding." She asserts that the court's consideration of Father's temporary custody was prejudicial to her.

 Mother's position effectively prohibits a trial court from considering to any degree the care and condition of the children during the pendency of the dissolution. We dispute the merit of such a restriction. Instead, we find that, while it would be improper for a trial court to award permanent custody to a parent simply *because* that parent had been awarded temporary custody, it is permissible as part of a determination of the children's best interests for the court to consider the status and well-being of the children pending the final hearing. *Cf. Wiggins,* 737 N.E.2d at 442 (evidence of a child's improving condition while under the temporary custody of noncustodial parent, while by itself will not support modification of custody, is part of trial court's consideration of child's best interest and is admissible). Regardless, however, even if we were to find that the trial court should not have considered how the children fared while in Father's temporary custody, we find any error was harmless in light of the remaining evidence supporting the trial court's custody award, including Dr. Lawlor's report and recommendation.

We conclude that the evidence supports the trial court's findings and that the findings amply support a judgment of custody to Father. Our decision in this regard is not a statement that no evidence existed in support of a contrary result. Rather, after reviewing the evidence in the light most favorable to the trial court's judgment, we find no error in the trial court's award of custody of the minor children to Father.

### IV. Discovery Sanctions

During the course of the dissolution, discovery disputes arose over Father's dis-

covery requests, namely various interrogatories and production requests concerning CJT, its stock, and the trust from which Mother received $100,000 in 1996. Determining that Mother failed to comply with discovery, the trial court entered against Mother a $4,892 judgment, representing attorneys' fees and accountants' fees Father incurred as a result of Mother's non-compliance with such discovery.

The Indiana rules of discovery are designed to allow a liberal discovery procedure, the purposes of which are to provide parties with information essential to litigation of all relevant issues, to eliminate surprise, and to promote settlement. *Pierce v. Pierce,* 702 N.E.2d 765, 767 (Ind. Ct.App.1998), *trans. denied* (1999). Discovery is designed to be self-executing with little, if any, supervision of the court. *Id.* However, when trial court intervention is necessary, the court is vested with broad discretion in ruling on discovery issues. *Id.* We will interfere with the trial court's decision only where we find an abuse of that discretion. *Id.* In order to demonstrate reversible error, the moving party must show that the ruling prejudiced her. *Id.*

Here, Mother's general position with regard to CJT and its stock was that (1) the requested information was not in her possession, and (2) Father was a shareholder in the corporation and had equal access to the requested information. Mother also claimed that Father's requests for, among other things, stock ledgers and documents restricting transfer or disposition of CJT stock were "not relevant to this case." *Appellee's Appendix* at 42. Father eventually served third-party document requests upon CJT, who refused to produce documents on the basis that the informa-

tion was confidential and proprietary, and further, it asserted that the Indiana dissolution court lacked jurisdiction over it, an Illinois corporation. Father then attempted to obtain the requested information via a shareholder demand, which CJT denied. Father subsequently submitted a revised second demand in order to pare down requests and also to comply with notarization requirements of Delaware corporate law. CJT, however, continued to refuse to comply on the basis that the requests were made for an "improper purpose." *Id.* at 29, 33.

Mother similarly refused to produce the requested information concerning the trust, established by Mother's father, Charles Trost. Initially, in an answer to an interrogatory, Mother identified as personal property the $100,000 that she received as an inheritance from her father's trust. She stated "This trust can be used for education or housing specifically." *Id.* at 21. However, in her subsequent deposition, she explained that at the time of the $100,000 distribution, she could have elected to receive stock or cash, and that "I could have used the money in any way I wanted to." *Id.* at 69.

Thereafter, Father served Mother with additional requests for information concerning the trust by interrogatories which inquired as to the name of the trust, name and address of the trustee, date it was established, whether it still is in effect, its value, the name and address of all beneficiaries, and the total value of all distributions to Mother. Father also requested a copy of the trust instrument, documents relative to distributions and beneficiaries, and any accountings. *Id.* at 24–25. Mother initially did not respond,[5] and Father thereafter filed a motion to compel, seek-

---

5. Mother claimed that she had timely produced answers; Father maintained he had not received any responses.

ing responses on this trust matter, as well as the information sought on CJT and its stock. The court granted the motion, and ordered that Father was entitled to a reasonable amount of fees, to be determined at the final hearing of the matter. *Id.* at 41.

Following the court's order on Father's motion to compel, Father received Mother's response to the interrogatory inquiries concerning the trust: "I do not have this information except that the value of the trust is $100,000.00." *Id.* at 44. With regard to the document requests, she likewise responded that "I do not have this information." *Id.* at 44–45, 49–50. Other evidence before the court, however, would indicate that Mother had at least some information concerning the trust, as she disclosed her knowledge that "[S]he may apply for early distribution only in the event of extreme circumstances relating to education and/or housing. Application for this trust fund is not automatically granted and an interview process is required by the terms of the irrevocable trust." *Id.* at 42.

In at least two pretrial conferences, the trial court again ordered Mother to comply and "fully cooperate" with the pending discovery. *Id.* at 59, 71. The court also ordered Mother to provide "any authorizations needed to receive information regarding the trust." *Id.* at 71. Although Mother provided such an authorization to Father, the requested information was never obtained; the Illinois trust company deemed the trust agreement confidential and declined to disclose it. *Id.* at 55, 61.

 In its findings and conclusions, the trial court found that Mother failed to adequately respond to many of Father's discovery requests and that Father incurred substantial fees and costs, which would not have been incurred if Mother had made complete and unevasive respons-

es to Father's requests. *Appellant's Appendix* at 27. As a consequence of her noncompliance, the trial court entered a judgment against Mother for fees and costs in the amount of $4,892.

Ind. Trial Rule 37(B) provides trial courts with the sanctions they may impose for non-compliance with discovery orders. It provides in relevant part:

(2) Sanctions by court in which action is pending. If a party ... fails to obey an order to provide or permit discovery, including an order made under subdivision (A) of this rule ..., the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

(a) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

(b) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence;

(c) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;

(d) In lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders except an order to submit to a physical or mental examination under Rule 35;

(e) Where a party has failed to comply with an order under Rule 35(A) requiring him to produce another for ex-

amination, such orders as are listed in paragraphs (a), (b), and (c) of this subdivision, unless the party failing to comply shows that he is unable to produce such person for examination.

In lieu of any of the foregoing orders or in addition thereto, *the court shall require the party failing to obey the order* or the attorney advising him or both *to pay the reasonable expenses, including attorney's fees, caused by the failure,* unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

T.R. 37(B) (emphasis added).

Here, the trial court's sanction of fees was not only permissible, but indeed was required as T.R. 37(B) imposes the obligation that the trial court "shall require the party failing to obey the order to pay reasonable expenses, including attorney's fees[.]" Although Mother maintains that she complied to the best of her ability, the trial court apparently remained unconvinced, considering that Mother was a shareholder, director, and 5% owner in CJT, her family's company, and that she had received at least one significant inheritance or distribution from her father's trust. Perhaps had Mother offered any information or evidenced cooperation in some degree, rather then flatly asserting that the information and/or documents were not in her possession or were unavailable to her, the trial court might not have concluded that Mother's conduct was evasive.[6] We find no abuse of discretion in the sanctions imposed against Mother.

### V. Appellate Attorney Fees

Lastly, we address Father's request for appellate attorneys' fees. He ar-

gues that Mother's appeal was without merit and without legal or factual support. We disagree.

Ind. Appellate Rule 66(E) states, "The court may assess damages if an appeal, petition, or motion, or response, is frivolous or in bad faith. Damages shall be in the Court's discretion and may include attorneys' fees. The Court shall remand the case for execution." We are mindful that such an award is discretionary and may be ordered when an appeal is replete with meritlessness, bad faith, frivolity, harassment, vexatiousness, or purpose of delay. *Reed Sign Serv., Inc. v. Reid,* 755 N.E.2d 690, 699 (Ind.Ct.App. 2001), *trans. denied* (2002). However, we must use extreme restraint when exercising our discretionary power to award damages on appeal because of the potential chilling effect upon the exercise of the right to appeal. *Id.* The sanction of appellate damages for lack of merit should be applied only when the party's contentions and arguments are utterly devoid of all plausibility. *Id.*

In this case, the manner and merit of Mother's arguments were not utterly devoid of plausibility. Rather, they were reasonable challenges to the trial court's exercise of discretion. We decline to award fees in favor of Father.

Affirmed.

MATHIAS, J., and BARNES, J., concur.

---

**6.** For instance, during the final hearing Father's counsel inquired about what efforts Mother made to obtain the requested information concerning the trust. Mother replied that she "was not in a position to obtain [the requested information concerning the trust] without the permission of the people involved." *Appellee's Appendix* at 87. She then admitted that she never sought such permission. *Id.*