**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Aug 22 2014, 6:19 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**BRYAN LEE CIYOU**
**LORI B. SCHMELTZER**
Ciyou & Dixon, P.C.
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**MAUREEN E. GADDY**
Gaddy & Gaddy
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| ERIK A. LENNING, | ) |
| | ) |
| Appellant/Respondent, | ) |
| | ) |
| vs. | ) No. 49A02-1312-DR-1009 |
| | ) |
| WENDY K. SHORT | ) |
| | ) |
| Appellee/Petitioner. | ) |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Victoria M. Ransberger, Magistrate
Cause No. 49D01-0206-DR-001016

**August 22, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**VAIDIK, Chief Judge**

## Case Summary

After more than ten years of litigation, the Marion Superior Court dissolved the marriage of Erik A. Lenning ("Father") and Wendy K. Short ("Mother") and granted sole legal and physical custody of the parties' two children to Mother. Father appeals, arguing that the trial court abused its discretion by granting Mother sole custody. Concluding that the trial court did not abuse its discretion, we affirm.

## Facts and Procedural History

Mother and Father were married in 2000 and their son B.L. was born in late 2000. The parties separated in 2002 and filed for dissolution a short time later.

When dissolution proceedings began, Father was incarcerated and Mother had a protective order against him. In July 2002 the trial court entered preliminary orders granting Mother custody of B.L. and awarding Father supervised parenting time. After nearly three years in delays, a final hearing was set for July 2005. But Mother and Father reconciled in early 2005, and their second child, D.L., was born. The reconciliation was short-lived, and the parties separated again. Around this time, Father alleged that Mother was abusing drugs, and in December 2005, Mother tested positive for cocaine. As a result, the trial court granted Father temporary custody of B.L. Because D.L.'s paternity had not been established,[1] D.L. remained in Mother's care, and Mother completed a drug-rehabilitation program. In 2008, after years of additional litigation and continuances

---

[1] It appears there was some dispute about D.L.'s paternity; genetic testing was ordered in early 2006. Appellant's App. p. 6 (CCS).

sought by both parties—D.L.'s paternity was established during this time—the parties agreed that Father would have temporary custody of both children.

In 2009 Father filed notice of his intent to relocate to Michigan. Mother challenged Father's relocation, but the trial court ultimately permitted Father to relocate with the children, and the court granted Mother parenting time. At this point, Father began to interfere with Mother's relationship with the children by limiting Mother's contact with the children. In 2012 Mother sought temporary custody of the children. After a number of continuances, hearings were set for 2013, and a custody evaluation was ordered.[2] Because the parties were still married, these hearings also served as final hearings in the ongoing dissolution matter.

At the first hearing, Dr. John Ehrmann, who had recently performed a custody evaluation, testified at length about the acrimonious relationship between Mother and Father and the children's well-being. Dr. Ehrmann began by addressing Father's interference with Mother's relationship with the children, saying that Father would frequently ignore Mother's phone calls. Tr. p. 25. When Mother reached the children on the phone, they would be punished for speaking to her. *Id.* at 42. On other occasions, Mother would make plans with Father to travel to Michigan, but once she arrived, Father would not let her see the children. *Id.* Father reported to Dr. Ehrmann that "in his opinion [Mother] didn't need to talk with the children, didn't need to see the children and [] he would be particularly pleased if she, in essence, ceased to exist and was not going to

---

[2] This was the third custody evaluation ordered in this case.

be a part of their lives." *Id.* at 27. To this end, Father told the children that Mother was dead. *Id.* at 43, 56. Father also instructed the children to call Mother by other names.

Despite Father's interference, Mother continued to send cards and gifts to the children, many of which were refused by Father. *Id.* at 27-28. The children reported that they "rarely heard from their mother, she rarely called, they rarely received things from her and . . . anything they didn't receive from her, their father th[rew] away." *Id.* at 28. Yet on occasion, Father would contact Mother and ask for financial help. In response to one such request, Mother sent Father $1000 for his heating bill. *Id.* at 29.

Dr. Ehrmann described meeting with the children over the course of several months, and testified that he was increasingly troubled by their behavior:

> [T]hey are caught in the middle of as much conflict as I've seen in . . . a long time. That is extremely difficult for children. It's very confusing, it's unsettling. Uh, when I saw the boys in the last month twice, their anxiety and apprehension about what's going on in Michigan has increased significantly, they were tearful, they were afraid, they were upset and they were pleading with me not to have to go back.

*Id.* at 48. The doctor explained that pre-teen B.L. reported an incident in which, after he wet his bed, Father "hit him so hard in the face, it knocked him to the floor and his ear was ringing and he couldn't hear for a while." *Id.* at 57. After this incident, B.L. was forced to sleep on the floor because "he didn't deserve a bed." *Id.* B.L. said that he was afraid Father might kill him. *Id.* at 58. B.L. also told Dr. Ehrmann that he "really get[s] in trouble with [Father] if [Mother] calls," and that he was afraid to talk to Mother on the phone" because Father "gets mad at me and he screams '[Mother's] a f****** liar and a b****.'" *Id.* at 61. When talking about the future, both boys began "rocking back and

4

forth on the couch, starting to cry, begging me not to go back [to Michigan]—pleading literally." *Id.* at 59.

Dr. Ehrmann ultimately recommended that Mother have primary custody of the children:

> I felt that this was a very, very clear-cut case. I was very concerned about Father's attitude about Mother and his continuing refusal to include Mother in the lives of his children. Um, and [I] felt that there were other factors here that led me to endorse Mother as the most appropriate choice as a . . . primary custodial parent.

*Id.* at 49. Dr. Ehrmann recommended that Father have parenting time with the children. At the conclusion of the first hearing, based on the doctor's testimony, the trial court decided to place the children with Mother until the next hearing, and the court granted Father parenting time. A few weeks after the first hearing, the trial court learned that Michigan child-protective services had begun investigating Father. After speaking with counsel by phone, the trial court required Father's parenting time to be supervised. Appellant's App. p. 28 (CCS). Father's counsel later requested that the supervised parenting time take place at Kids' Voice. *Id.*

At the next hearing six months later, Dr. Ehrmann told the court that the boys were improving, saying that they had settled in very comfortably, though they had some ongoing nightmares. *Id.* at 396. Their relationship with Father was strained—both boys had reported to Dr. Ehrmann that Father called them, but "he is often angry, [and] yells at them, [and] sometimes uses bad language . . . ." *Id.* They also reported being afraid that Father would kidnap them. *Id.* at 397. The children told the doctor that they were happy

living with Mother and did not want to return to Michigan. *Id.* at 397. They had not seen Father since they began living with Mother.

Mother and Father also testified. Mother admitted that she tested positive for cocaine in 2002, but she provided evidence of regular drug screens showing no other drug use. *Id.* at 315. She confirmed Dr. Ehrmann's testimony about Father's interference with her relationship with the children, saying that Father thwarted her attempts to see the boys and would berate her when she called them on the phone. *Id.* at 324-26. Mother also talked about the children's progress since coming to live with her. She had enrolled the children in school and counseling, and both children were seeing a physician for bedwetting, which had greatly improved. *Id.* at 339-42. Mother testified that she had arranged to pay the fees necessary to begin Father's supervised visitation at Kids' Voice. *Id.* at 329-30. Father testified that he did not know about Mother's offer to pay the initial costs of supervised visitation. He denied many of Dr. Ehrmann's statements about his attitude toward Mother and expressed concern about her ability to care for the children.

The trial court took the matter under advisement. In December 2013 the trial court issued its decree of dissolution. After setting forth the entire case history, the court granted Mother sole physical and legal custody of the children, holding in relevant part:

> 14. After careful consideration and hours of testimony with review of all the custody and [guardian ad litem] reports, the Court finds that it is in the best interests of the minor children, [B.L.] and [D.L.], that sole custody is granted to Mother. These parties cannot work together or make decisions together. Father has attempted to alienate the children by telling them that [Mother] is dead, failing to list her on any school documents, failing to allow her parenting time in Michigan, and failing to keep her informed of virtually anything regarding the children. When Father was confronted regarding telling the children that Mother was dead, he told the children to

6

call [] Mother by her first name . . . and refer to Father's girlfriend as 'mom.'

15. The evaluation by Dr. Ehrmann is chilling in the description of the boys' fear of [] Father, the treatment of the children at the hands of Father, and the absolute conviction expressed by Dr. Ehrmann that the children should not be returned to Father.

16. Father was ordered to have supervised parenting time at Kids' Voice following the first day of trial in April 2013. He failed to complete the intake and has not made any effort to see his children in months. Father wants this court to believe that because the [Michigan child-protective services] investigation of his home and alleged physical abuse of the boys was unsubstantiated, he should have the boys back in his care.

17. The actions by Father towards his minor children have endangered the minor children's health and have significantly endangered their emotional development. Granting Father unsupervised parenting time pursuant to the Indiana Parenting Time Guidelines would continue to endanger the minor children's health and significantly endanger their emotional development. Based on the above, the Court grants Father [supervised] parenting time subject to the following conditions . . . .

Appellant's App. p. 35-36. Father was ordered to pay $108 per week in child support. *Id.* at 37. The trial court also divided the parties' marital property and dissolved the marriage. *Id.* at 39.

Father now appeals.

**Discussion and Decision**

Father contends that the trial court applied the wrong legal standard in determining custody. He also argues that the court abused its discretion by awarding Mother sole custody of the children.

A trial court's custody determination is afforded considerable deference as it is the trial court that sees the parties, observes their conduct and demeanor, and hears their testimony. *Trost-Steffen v. Steffen*, 772 N.E.2d 500, 509 (Ind. Ct. App. 2002), *trans.*

7

*denied.* We do not reweigh the evidence, determine the credibility of witnesses, or substitute our judgment for that of the trial court. *Id.* We will not reverse the trial court's custody determination unless it is clearly against the logic and effect of the facts and circumstances before the court or the reasonable inferences drawn therefrom. *Id.*

## I. Applicable Standard

The trial court concluded that this was an initial custody determination. Father contends that this was error. He argues that the court should have applied the custody-modification standard because "the children effectively had a permanent custody determination years prior . . . ." Appellant's Br. p. 21.

The difference between the two standards is significant. In an initial custody determination, there is no presumption for either parent, and the trial court's determination is based on the best interests of the child. *Id.* In a custody-modification case, the party seeking to modify custody bears the burden of demonstrating that the existing custody should be altered. *Apter v. Ross*, 781 N.E.2d 744, 758 (Ind. Ct. App. 2003), *trans. denied*.

Although this litigation has lasted more than ten years, during that time, only temporary custody orders have been entered. Thus, the trial court properly applied the initial-custody-determination standard. When making an initial custody determination, a trial court must consider all evidence dating back to the child's birth in determining what custody arrangement would be in the children's best interests. *Hughes v. Rogusta*, 830 N.E.2d 898, 902 (Ind. Ct. App. 2005). Father contends that if the initial-custody-determination standard applies, the trial court applied it incorrectly by considering only

recent events, particularly those after 2009. The trial court indeed stated at the hearings that it was "more concerned about what's been happening since . . . 2009," Tr. p. 84, and its final order indicates that it considered that time frame at length. But the final order also reflects the court's consideration of the entire case history, including the years that Father had temporary custody of the children. The court did not err in emphasizing recent events; Father moved to Michigan in 2009 and after the move, he began to interfere with Mother's relationship with the children. Given the importance of these events and their troublesome effect on the children, it was simply not unreasonable for the trial court to find this time period to be particularly relevant to its analysis. We find no error here.

## II. Custody Determination

Father also contends that the trial court erred by granting sole custody to Mother.[3] He claims that the children's best interests are served by placement with him.

When making a custody determination, the trial court must consider a number of factors, including the child's age, the wishes of the parents, the child's wishes, the relationship the child has with his or her parents, sibling(s), and others, the child's adjustment to home, school, and community, the mental and physical health of all involved, any evidence of domestic or family violence, and any evidence that the child has been cared for by a de facto custodian. *See* Ind. Code § 31-17-2-8.

The record supports the trial court's conclusion that the children's interests are best served by granting Mother sole custody. For years, when the children were young,

---

[3] Father also argues that four of the trial court's findings—findings 14, 15, 16, and 17—are not supported by the evidence. Having thoroughly reviewed Father's claims, it is clear that these findings are supported by the evidence. Father's claims to the contrary are merely requests for this Court to reweigh the evidence, which we may not do. *See Trost-Steffen*, 772 N.E.2d at 509.

Father had custody of them, and Mother exercised regular parenting time. After 2005, Mother's parenting time was supervised because of a positive drug test. Father and the boys moved to Michigan in 2009, and Father began to limit Mother's contact with the children—Father would ignore Mother's phone calls, and when Mother reached the children on the phone, they would be punished for speaking to her. On many occasions, Mother traveled to Michigan to see the children, but once she arrived, Father would not let her see them. Father reported to Dr. Ehrmann that "in his opinion [Mother] didn't need to talk with the children, didn't need to see the children and [] he would be particularly pleased if she, in essence, ceased to exist and was not going to be a part of their lives." Father told the children that Mother was dead, and other occasions he encouraged the children to call Mother by other names. Despite this, Mother continued to send cards and gifts to the children. Father refused or threw away many of these items.

At the time of the hearings, Dr. Ehrmann expressed concern about the children's emotional health, describing them as anxious and apprehensive. Both boys begged Dr. Ehrmann not to return to Michigan. B.L., the parties' older son, described an incident in which Father struck him, knocking him to the floor. B.L. told Dr. Ehrmann that he was afraid Father might kill him. Dr. Ehrmann ultimately recommended that Mother have primary custody of the children, and after the first hearing, the trial court decided to place the children with Mother until the next hearing. The boys had improved by the time of the next hearing, six months later, and they had settled in comfortably with Mother. Their relationship with Father was strained—both boys reported that when Father called them, "he is often angry, [and] yells at them, [and] sometimes uses bad language . . . ."

10

The children—now thirteen and eight—told the doctor that they were happy living with Mother and did not want to return to Michigan.

Though Father had custody of the children for many years, he had, over time, attempted to sever the bond between Mother and the children. The children had become emotionally distraught; they expressed their fear of Father and their desire to live with Mother, and Dr. Ehrmann expressed serious concern about their wellbeing in Father's care. In the face of this evidence, Father argues that the children are adjusted to their home, school, and community in Michigan, and he claims that he is better equipped to care for the boys. He also argues that Mother has acted erratically over the years and reminds the court of Mother's single positive drug test in 2005. Father's arguments are an invitation to reweigh the evidence, which we may not do. *See Trost-Steffen*, 772 N.E.2d at 509. We cannot say, in light of all the evidence presented, that the trial court erred in granting Mother sole custody of the children.

Affirmed.

FRIEDLANDER, J., and MAY, J., concur.