## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 24 2015, 9:31 am

CLERK
of the supreme court,
court of appeals and
tax court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Matthew Daley | Jan Barteau Berg |
| Terre Haute, Indiana | Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| A.C., | September 24, 2015 |
| *Appellant-Petitioner,* | Court of Appeals Case No. 11A01-1501-DR-17 |
| v. | Appeal from the Clay Superior Court |
| H.C., | The Honorable J. Blaine Akers, Judge |
| *Appellee-Respondent.* | Trial Court Cause No. 11D01-1207-DR-444 |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Petitioner, A.C. (Mother), appeals the trial court's Final Decree and Dissolution of Marriage Order, pursuant to which Appellee-Defendant, H.C. (Father), was awarded custody of the parties' minor children, K.C. and N.C. (Children).

We affirm.

## ISSUES

Mother raises one issue on appeal, which we restate as the following two issues: (1) Whether the trial court abused its discretion by awarding sole legal and primary physical custody of the Children to Father; and

(2) Whether the trial court erred by considering evidence that was never offered for admission.

## FACTS AND PROCEDURAL HISTORY

On June 1, 2010, Father and Mother were married. Father is a staff sergeant in the United States Marine Corps and is presently stationed in Oceanside, California. Mother is a dancer at Club Koyote, an adult entertainment club located in west Terre Haute, Indiana. Both parties are native Hoosiers, and their extended family members all live in Indiana.

On January 25, 2011, the parties' first child, K.C., was born. Shortly after their two-year anniversary, on July 3, 2012, Mother filed a petition to dissolve the marriage. At the time, Mother was pregnant with the parties' second child.

Following an August 28, 2012 hearing, the trial court issued a Provisional Order on September 4, 2012, temporarily awarding sole legal and primary physical custody of K.C. to Father. As a result, K.C. moved to California with Father. The trial court ordered that Mother would be entitled to parenting time in accordance with the Indiana Parenting Time Guidelines, taking into account that distance is a major factor and K.C.'s young age. On November 6, 2012, Mother gave birth to N.C. On November 8, 2012, the trial court granted Mother's request for a temporary restraining order preventing Father from removing N.C. from the State of Indiana and awarding temporary custody of N.C. to Mother pending the final custody determination.

[6] Sometime after the birth of N.C., Father and Mother attempted to reconcile. In November of 2012, Mother and N.C. relocated to California, and on December 6, 2012, Mother filed for a continuance of the dissolution proceedings. The parties lived together as a family with their Children until September of 2013, at which time Father was deployed to Afghanistan for seven months. During Father's deployment, Mother and the Children moved back to Indiana. In April of 2014, Father returned from Afghanistan, and on May 28, 2014, he resumed the divorce proceedings by filing a motion for a Final Hearing. Although Father spent time with the Children in Indiana following his return, he did not resume his right to have temporary custody of K.C. under the trial court's Provisional Order. Rather, Father left both Children in Mother's care while he returned to California to await the Final Hearing.

On October 7, 2014, the trial court conducted the Final Hearing, during which both parents requested primary physical custody of the Children. On January 7, 2015, the trial court issued its Final Decree and Dissolution of Marriage Order. The trial court determined that Father "shall have the sole legal and physical custody" of the Children. (Appellant's App. p. 4). Mother received parenting time in accordance with the Parenting Time Guidelines and was ordered to pay $75.00 per week in child support. On January 22, 2015, the trial court supplemented its Final Decree and Dissolution of Marriage Order to clarify that in the event Father should be deployed on a military assignment that would cause him to be physically separated from the Children for a period of more than thirty days, Mother would be given temporary physical custody of the Children. Upon Father's return, he would immediately resume his right to primary physical custody.

Mother now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*[1]

"A trial court's custody determination is afforded considerable deference as it is the trial court that sees the parties, observes their conduct and demeanor and hears their testimony." *Kondamuri v. Kondamuri*, 852 N.E.2d 939, 945-46 (Ind.

---

[1] In this case, neither party requested special findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A), nor did the trial court issue factual findings and conclusions *sua sponte*.

Ct. App. 2006). Accordingly, on appeal, our court does not reweigh evidence or assess the credibility of witnesses, and we will not "substitute our judgment for that of the trial court." *Id.* at 946. We will uphold the trial court's custody determination unless "it is clearly against the logic and effect of the facts and circumstances or the reasonable inferences drawn therefrom." *Id.*

## II. *Custody Determination*

Mother claims that the trial court abused its discretion by granting sole legal and physical custody of the Children to Father. When rendering an initial custody determination pursuant to a dissolution proceeding, "there is no presumption favoring either parent." Ind. Code § 31-17-2-8. Rather, the trial court must "enter a custody order in accordance with the best interests of the child." I.C. § 31-17-2-8. In determining the best interests of a child,

> [t]he court shall consider all relevant factors, including the following:
> (1) The age and sex of the child.
> (2) The wishes of the child's parent or parents.
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
> (4) The interaction and interrelationship of the child with:
>     (A) the child's parent or parents;
>     (B) the child's sibling; and
>     (C) any other person who may significantly affect the child's best interests.
> (5) The child's adjustment to the child's:
>     (A) home;
>     (B) school; and
>     (C) community.
> (6) The mental and physical health of all individuals involved.
> (7) Evidence of a pattern of domestic or family violence by either

parent.
(8) Evidence that the child has been cared for by a de facto
custodian . . . .

I.C. § 31-17-2-8.

[11] In addition to contending that the trial court failed to "properly weigh the relevant [best interests] factors[,]" Mother asserts that a substantial change in circumstances warranted a modification of K.C.'s custody from Father to Mother whereas no such change occurred to merit the modification of N.C.'s custody from Father to Mother. (Appellant's Br. p. 4). *See* I.C. § 31-17-2-21(a) (providing that the trial court may not modify a child custody order unless the modification would serve the child's best interests *and* there has been a substantial change in at least one of the best interests factors set forth in Indiana Code section 31-17-2-8). In response, Father argues that because this was an initial custody determination rather than a modification of custody, the trial court was only required to consider the Children's best interests and not whether there had been a substantial change in circumstances.

[12] This court has previously relied on the custody modification standard even in the absence of a "legal initial custody determination," because one parent had "long acquiesced" to the other parent's physical custody of the child. *Kondamuri*, 852 N.E.2d at 945 (citing *In re Paternity of Winkler*, 725 N.E.2d 124, 128 (Ind. Ct. App. 2000)). In the present case, a Provisional Order awarded temporary custody of K.C. to Father, and Mother was granted temporary custody of N.C. pursuant to a temporary restraining order. Within a few

months of the provisional arrangements, the parties suspended the dissolution proceedings in an effort to reconcile, and Father and Mother lived together with the Children for approximately ten months. However, subsequent to Father's deployment, Mother returned to Indiana with the Children, and Father moved to resume the divorce proceedings upon his return from Afghanistan. Although both Children remained in Mother's care pending the Final Hearing, we do not find that Father acquiesced to Mother's custody of the Children. Rather, Father testified that when he returned from Afghanistan, he did not want to separate K.C. and N.C. as provided for under the provisional orders, and he "thought it would be more of a respectable thing to allow [the Children] to stay together[] until the [trial court] makes the final decision on who gets custody." (Tr. p. 49). Thus, we will rely upon the initial custody determination standard rather than the custody modification standard to resolve this case.

[13] Mother's sole argument on appeal is that the trial court determined the custody arrangement by improperly weighing the evidence concerning the Children's best interests. However, as already noted, it is not the role of this court to reweigh evidence. *Kondamuri*, 852 N.E.2d at 946. This is because "[i]t is particularly difficult for a reviewing court to second-guess a situation that centers on the personalities of two parents battling for control of a child." *Kirk v. Kirk*, 770 N.E.2d 304, 308 (Ind. 2002). Instead, we will consider whether the evidence most favorable to the trial court's judgment provides a sufficient basis to uphold the decision. *Trost-Steffen v. Steffen*, 772 N.E.2d 500, 509, 511 (Ind. Ct. App. 2002), *reh'g denied, trans. denied*. During the Final Hearing, both

parties presented evidence relating to the best interests of the Children. At that time, the parties' daughter, K.C., was three years old, and their daughter, N.C., would be celebrating her second birthday the following month. From the record, it is apparent that both Father and Mother love the Children, are bonded to the Children, and desire to be actively involved in the Children's lives. Both parties also presented evidence to demonstrate that they have suitable homes with separate bedrooms prepared for K.C. and N.C., and they informed the trial court of their arrangements and plans for childcare, preschool, and other extracurricular activities in the event of being awarded custody.

[14] Nevertheless, we find ample evidence in the record to support the trial court's custody determination in Father's favor. Father testified that he believed it would be in the Children's best interests to be in his custody because he "can provide them with better emotional stability, financial stability, [and] security." (Tr. p. 44). Father, whose house is located three miles from the military base, works from 7:30 a.m. to 4:00 p.m., Monday through Friday. The military base provides numerous options for licensed childcare, and he would be able to devote his non-working hours to caring for the Children. On the other hand, the trial court heard testimony that Mother works from 7:00 p.m. to anywhere from 3:00 to 5:00 a.m. three or four nights per week. While Mother works, the Children sleep at the home of their fifteen-year-old babysitter. Although Mother testified that her work schedule allows her to be with the Children during the day, she is only able to sleep before work if the Children take naps or

if she leaves the Children with the babysitter for extended periods of time. In addition to having a more structured and stable work schedule, Father has served in the military for over ten years, and he receives a consistent salary, health insurance, and housing allowance. At the time of the hearing, Mother had been employed by Club Koyote as an independent contractor for only four or five months and had indicated to Father on numerous occasions that she was unable to afford certain expenses.

[15] Also, at the time of the Final Hearing, Mother's driver's license was suspended, and she was not eligible for reinstatement until September 15, 2015. Despite the fact that this was her fifteenth license suspension, and in violation of the trial court's Provisional Order prohibiting Mother from driving the Children without a valid license, Mother admitted that she had been driving herself to work and transporting the Children to their activities. Such conduct not only exhibited disregard for the trial court's authority, it was also contrary to the Children's best interests as it jeopardized their safety. Moreover, for the eleven months between the Final Hearing and the reinstatement of her driver's license, Mother would be beholden to family and friends for transportation to and from work, the grocery store, and the Children's preschool and activities.

[16] Mother testified that the Children's best interests require placement with her because, whereas the Children do not know anyone beyond Father in California, their entire family lives in Indiana, including the Children's paternal half-sister. Although Mother explained that the Children are closely bonded to their half-sister, no evidence was presented to demonstrate that the Children

have a significant relationship with any other family members or that separation from other family members would be detrimental to the Children's well-being. The evidence also reveals that the Children's half-sister—*i.e.*, Father's child from a prior relationship—spends a portion of her summer vacation in California with Father, so the Children will still be able to spend time with their half-sister during these visits. Furthermore, the Children, who were only two and three years old at the time of the Final Hearing, had previously lived in California for almost a year during the time that Father and Mother were attempting to reconcile. According to Father, during that time, the Children did not suffer any "type of emotional instability [by] being away from the family." (Tr. p. 69). Father also testified that his military duty ends on March 30, 2018, at which time he plans to pursue a government-based job in Indiana. Thus, the Children's separation from any extended family members appears to be only temporary in nature.

[17] A few weeks before the Final Hearing, Mother enrolled the young Children in numerous extracurricular activities, including soccer, basketball, gymnastics, and dance. She then suggested that for Father's parenting time, she would be "willing to negotiate an appropriate length of time they spend with [Father] in California for their summer break, as long as it doesn't interfere with either or both of the [C]hildren's activities." (Mother's Exh. D). Considering that Mother scheduled the Children to participate in activities every day of the week, Father would have very little access to the Children under Mother's

condition that his parenting time not interfere with the Children's activities. Mother also testified that the Children should spend all holidays in Indiana.

[18] In turn, Father demonstrated far greater flexibility in his willingness to foster the Children's relationship with Mother. When asked about his preference for Mother's parenting time, Father stated:

> Basically, . . . anytime they're not in school. . . . [S]ummer breaks, fall breaks, spring break, . . . anytime that she wants to come to California, . . . you know I'll insure that I provide a place for her to be able to stay to where she can visit the kids. . . . I'm offering to pay 50% of the travel expenses. . . . [B]asically so if the kids, you know if they come back here you know, I'll pay [for] them to come here, she pays for them to come back. . . . [J]ust as an example, . . . you know anytime that she wants to spend [with] the kids, I will never deny it. . . . [I]f she wants to make a trip to California, and she wants to stay out there a couple months, by all means she can stay out there and visit with the kids as long as she wants.

(Tr. p. 53). Father further testified that when K.C. was living in California, Father made sure that Mother was able to video-chat with K.C. every day. However, when the Children were in Mother's care, she refused to provide Father with the various babysitters' names and contact information while she worked, and Father was unable to regularly communicate with the Children. Additionally, several months prior to the Final Hearing, Mother moved from Linton, Indiana, to Terre Haute without notifying Father of her relocation, and she refused to provide Father with her current address. Accordingly, the evidence demonstrates that by awarding custody of the Children to Father, *both* parents will be more likely to maintain a close relationship with the Children.

Based on the totality of the evidence concerning the Children's best interests, we cannot say that the trial court abused its discretion by awarding custody of the Children to Father.

### III. *Consideration of Video-Recordings*

Mother next claims that the trial court abused its discretion by considering a video-recording that was not admitted into evidence. During the Final Hearing, Father testified that he had observed Mother, in June of 2014 and on at least one other occasion, driving her vehicle with one child sitting on her lap pretending to steer and the other child standing on the seat, unrestrained. While riding with Mother during these instances, Father stated that he video-recorded the conduct on his cell phone before informing Mother that such behavior was inappropriate. In order to corroborate Father's testimony and without any objection from Mother, Father's counsel handed Father's cell phone to the trial court and played the recording. As Father's counsel prepared to cue up the second video, the trial court stated "I don't need to see this, I'll take [Father's] testimony that it happened again." (Tr. p. 60). Normally, the admission or exclusion of evidence is a matter reserved to the trial court's discretion and is subject to reversal only if a party's substantial rights are affected. *In re Paternity of H.R.M.*, 864 N.E.2d 442, 445-46 (Ind. Ct. App. 2007). In this case, Father never offered the video-recording into evidence.

Father posits that Mother has waived the issue for appeal by failing to object to the viewing of the video-recording during the hearing. In general, the failure to object to an issue before the trial court constitutes a waiver of the matter for

appeal. *See Francies v. Francies*, 759 N.E.2d 1106, 1113 (Ind. Ct. App. 2001), *reh'g denied, trans. denied*. Notwithstanding any waiver, we agree with Mother that it would have been improper for the trial court to consider the video-recording because it was never admitted into evidence. *Cochran v. Rodenbarger*, 736 N.E.2d 1279, 1283 (Ind. Ct. App. 2000). However, without specific findings of fact or conclusions thereon, we have no basis for discerning whether, or to what extent, the trial court actually considered the video-recording as evidence in its custody decision. On appeal, our court acts under the presumption that the trial court followed the applicable law and made the proper considerations in reaching its decision. *Harris v. Smith*, 752 N.E.2d 1283, 1289 n.6 (Ind. Ct. App. 2001), *reh'g denied*. Furthermore, regardless of the contents of the video-recording, it was well within the discretion of the trial court to believe Father's testimony, which Mother did not contradict, that Mother had repeatedly jeopardized the safety of the Children by driving without properly restraining them in child safety seats. We find no reversible error.

## CONCLUSION

[21] Based on the foregoing, we conclude that the trial court acted within its discretion in awarding custody of the Children to Father. We further conclude that Mother has not presented an adequate basis for reversal regarding the trial court's alleged consideration of improper evidence.

[22] Affirmed.

[23] Brown, J. and Altice, J. concur