Cynthia G. BRINKMANN,
Appellant–Petitioner,

v.

Curtis W. BRINKMANN, Appellee–
Respondent.

No. 55A01–0109–CV–352.

Court of Appeals of Indiana.

July 10, 2002.

M. Kent Newton, C. Duane O'Neal, Todd Richardson, Melanie K. Uptgraft, Amanda R. Blystone, Indianapolis, IN, James Admire, Franklin, IN, Attorneys for Appellant.

Roger P. Ralph, Jarrod K. Ralph, Indianapolis, IN, Attorneys for Appellee.

## OPINION

RATLIFF, Senior Judge.

### STATEMENT OF THE CASE

Petitioner–Appellant Cynthia G. Brinkmann ("Cynthia") appeals from the trial court's order terminating payments she was receiving from Respondent–Appellee Curtis W. Brinkmann ("Curtis") pursuant to their Decree of Dissolution.

We reverse.

### ISSUES

Cynthia raises several issues for our review which we restate as follows:

I. Whether the trial court erred by terminating payments Cynthia was receiving from Curtis after finding that the payments were in the nature of maintenance instead of a property settlement.

II. Whether the reconciliation and subsequent remarriage of the parties abrogates a property settlement agreement.

*FACTS AND PROCEDURAL HISTORY*

Cynthia filed a petition for dissolution of her marriage to Curtis on September 7, 1994. On October 27, 1995, the trial court entered a decree of dissolution ending Curtis and Cynthia's marriage. In the decree, the trial court approved the Brinkmanns' agreement which was orally presented to the court on October 10, 1995, and then submitted in written form as the decree. At issue is the language contained in the decree as follows:

> That the parties entered into the following oral settlement agreement which was stipulated into evidence at the time of final hearing.
>
> 1. That Cynthia G. Brinkmann should have as her own and separate property the 1989 Buick automobile, the furniture, household goods and personal property in her possession, the proceeds from the sale of the marital residence in the sum of Seventy–Two Thousand Seven Hundred Sixty Dollars and two cents ($72,760.02); that in addition to the above Cynthia G. Brinkmann shall receive alimony in the sum of Two Hundred Seventy–Seven Thousand Two Hundred Forty Dollars ($277,240.00) with interest, at the rate of 5% per annum payable weekly over a period of ten (10) years and one (1) month pursuant to the amortization schedule attached hereto and marked "Exhibit A"; said payments are includable in Cynthia G. Brinkmann's income and deductible by Curtis W. Brinkmann from his income for state and federal tax purposes; the parties stipulate and agree that said alimony payments are specifically not property settlement and survive Cynthia G. Brinkmann's remarriage or death; that the parties further stipulate and agree that said alimony payments are not dischargeable in bankruptcy.
>
> 2. That Curtis W. Brinkmann shall have as his own and separate property all interest in Brinkmann Excavating, Inc., any real estate owned by him in his individual name or corporate name, the houseboat, the furniture, household goods and personal property in his possession.

Appellant's App. 9–10. At the time the decree was entered Brinkmann Excavating, Inc., was valued at approximately, $535,000.00. The marital estate was estimated to have a gross value of approximately $800,000.00 and a net value of approximately $700,000.00. Appellant's App. 79.

Thereafter, Curtis made payments to Cynthia pursuant to the decree. Further, Curtis and Cynthia began seeing each other periodically until 1997 when they began living together. Curtis continued to make the payments while they were dating, and ultimately turned over his income to Cynthia when they began living together. On October 15, 2000, Curtis and Cynthia remarried each other. However, on February 2, 2001, Cynthia filed a petition for dissolution of her second marriage to Curtis. In April 2001, Curtis filed a verified petition to revoke maintenance and child support.

On June 29, 2001, the trial court ordered as follows:

> IT IS THEREFORE ORDERED that the Respondent's Petition to Revoke Maintenance is granted. The Respondent's obligation to pay spousal maintenance to the Petitioner terminated, effective October 14, 2000. The Respondent must pay any outstanding arrearage in spousal maintenance due and owing to the Petitioner as of October 14, 2000, less credit for amounts actually paid by the Respondent, the amounts referred to by the Petitioner in Exhibit 1 and the amount of child

support arrearage owed by the Respondent to the Petitioner as of October 14, 2000.

Appellant's App. 77.

Cynthia filed a motion to correct errors with the trial court, which was denied on August 28, 2001. This appeal ensued.

## DISCUSSION AND DECISION

### I. Spousal Maintenance or Property Settlement

Cynthia claims that the trial court erred when it characterized the payments made by Curtis to her as maintenance instead of a property settlement. The trial court specifically found that the payments were for spousal maintenance and not as property settlement or marital property division. Appellant's App. 76.

■ When a party has requested specific findings of fact and conclusions of law pursuant to Ind.Trial Rule 52(A), the reviewing court may affirm the judgment on any legal theory supported by the findings. *Mitchell v. Mitchell,* 695 N.E.2d 920, 923 (Ind.1998). In addition, before affirming on a legal theory supported by the findings but not espoused by the trial court, the reviewing court should be confident that its affirmance is consistent with all of the trial court's findings of fact and inferences drawn from the findings. *Id.* In reviewing the judgment, we first must determine whether the evidence supports the findings and second, whether the findings support the judgment. *Ahuja v. Lynco Ltd. Medical Research,* 675 N.E.2d 704, 707 (Ind.Ct. App.1996), *trans. denied.* The judgment will be reversed only when clearly erroneous. *Id.* Findings of fact are clearly erroneous when the record lacks any evidence or reasonable inferences from the evidence to support them. *Id.* To determine whether the findings or judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom, and we will not reweigh the evidence or assess witness credibility. *Id.* A judgment is clearly erroneous even though there is evidence to support it if the reviewing court's examination of the record leaves it with the firm conviction that a mistake has been made. *Owensby v. Lepper,* 666 N.E.2d 1251, 1256 (Ind.Ct.App. 1996), *reh'g denied.*

■ In this case, neither party requested specific findings of fact or conclusions of law. Nevertheless, the same standard of review applies when the trial court gratuitously enters findings of fact and conclusions of law, with one notable exception. *See Breeden v. Breeden,* 678 N.E.2d 423, 425 (Ind.Ct.App.1997). When the trial court enters such findings *sua sponte,* the specific findings control only as to the issues they cover, while a general judgment standard applies to any issue upon which the court has not found. *Id.* We may affirm a general judgment on any theory supported by the evidence adduced at trial. *Id.*

■ A panel of this court stated that a divorce court has not only the power but a mandatory duty to adjust and adjudicate the property rights of parties. *See Eppley v. Eppley,* 168 Ind.App. 59, 341 N.E.2d 212, 217 (1976). The court further stated that "alimony in Indiana is nothing more than a property settlement worked out by the court." *Id.* It is not future support for a wife nor is it a medium for compensating a party whose sensitivities were injured during marriage. *Id.* In *Voigt v. Voigt,* 670 N.E.2d 1271 (Ind.1996), our supreme court discussed the shift in marital dissolution law from alimony to spousal maintenance. The supreme court noted that:

before the adoption of the Dissolution Act, Pub.L. No. 297, 1973 Ind. Acts

1585, Indiana courts were expressly authorized to award "alimony" in divorce decrees, if the award would be "just and proper." ... The purpose of such an award was to settle property rights, not to provide for spousal support.... In the Dissolution Act of 1973, Indiana edged away from the strict policy against spousal support.... For the first time courts were expressly authorized to award maintenance.... In 1984, the General Assembly revised the maintenance provision and slightly expanded the grounds upon which courts could order maintenance. P.L. 150–1984, §§ 1–2, 1984 Ind. Acts 1290, 1290–92.... In ordering maintenance today, an Indiana court is restricted to three, quite limited options. First, it may grant incapacity maintenance if it "finds a spouse to be physically or mentally incapacitated to the extent that the ability of the incapacitated spouse to support himself is materially affected." [*See now* Ind.Code § 31–15–7–2(1).] Second, a court may order caregiver maintenance if it finds that a spouse must forego employment in order to care for a child with a physical or mental incapacity. [*See now* Ind.Code § 31–15–7–2(2).] Third, a court may order rehabilitative maintenance for no more than three years if it finds that a spouse needs support while acquiring sufficient education or training to get an appropriate job. [*See now* Ind.Code § 31–15–7–2(3).] Where none of these circumstances exist, a court may not order maintenance without the agreement of the parties.... The parties may themselves provide for maintenance in settlement agreements where the court could not otherwise order it. (Citations omitted).

*Voigt*, 670 N.E.2d at 1275–77.

■ Furthermore, a panel of this court specified various factors to be considered when determining whether periodic payments are in the nature of maintenance or a property settlement. *See In re Marriage of Buntin*, 496 N.E.2d 1351, 1354 (Ind.Ct.App.1986). Factors which tend to indicate an award of maintenance are as follows:

> the designation as maintenance; provisions terminating the payments upon the death of either party; payments made from future income; ... provisions for termination upon remarriage; ... provisions calling for modification based upon future events; and payments for an indefinite period of time. [Citations omitted.]

*Id.* Periodic payments are more in the nature of a property settlement if the following is true:

> The payments are for a sum certain payable over a definite period of time; ... there are no provisions for modification based on future events; the obligation to make payments survives the death of the parties; ... the provisions call for interest; and the award does not exceed the value of the marital assets at the time of the dissolution. [Citations omitted.]

*Id.*

■ Examining the factors present in the case at bar it is apparent that the trial court erred by characterizing the periodic payments by Curtis to Cynthia as maintenance. The evidence does not support the findings and the findings do not support the judgment. Curtis was to pay to Cynthia $277,240.00, a sum certain, payable in weekly increments over ten years and one month, a definite period of time. The interest was calculated at five percent per annum and the parties attached an amortization schedule to the agreement. There

is no provision for modification based upon future events. In fact, the agreement specifically states that the obligation survives Cynthia's remarriage or death. One of the items awarded to Curtis was Brinkmann Excavating, Inc. That asset alone was valued at $535,000.00. Therefore, the award to Cynthia of periodic payments totaling $277,240.00 could not exceed the value of the marital estate at the time of the dissolution. The provisions in the case at bar meet more of the property settlement factors than the spousal maintenance factors.

▇▇▇ Curtis places great emphasis on the fact that the parties stipulated in the agreement that the payments were alimony and specifically are not property settlement. However, it is apparent from the settlement agreement language that this is a property settlement. As a panel of this court stated in *Buntin*, "The use of the label 'maintenance' is but one factor to be considered. When the document is examined in light of all the relevant factors, it is revealed that the award in this case was part of the property settlement and not maintenance." *Id.* Without the $277,240.00 award to Cynthia as a property settlement, she would have received far less than the statutory presumption of an equal division of assets. *See* Ind.Code § 31–15–7–5. There is nothing in the agreement or in the testimony presented to the trial court to indicate that the parties intended anything less than an equal division of assets by way of property settlement.

The following is testimony Cynthia gave during the hearing in which the parties' agreement was orally presented to the trial court. We find this to be persuasive evidence that Cynthia was concerned about receiving her share of the marital pot.

Q: Do you know the difference between tangible assets and intangible assets? What I'm talking about ... tangible assets being those things like trucks and equipment and things like that, and intangible assets being goodwill, value placed upon things as a result of ... of profits and things such as that?

A: Yes.

Q: Well, one of the biggest concerns since there were no other tangible assets other than the Buick and your household goods and basically these proceeds, one of the biggest concerns we had in this case was how were you going to be paid and how could we guarantee payment to you. Is that right?

A: Yes.

Q: So, we factored in an interest factor of five percent. The balance due you was two hundred seventy seven thousand, two hundred and forty dollars and we have agreed that that is going to be in the form of alimony.

A: Yes.

Q: Now what that means to you is that once the amortization schedule is given that you are going to basically receive a flat payment annually or what's been represented to us ... a flat payment annually of approximately thirty five thousand dollars in alimony. That means that full thirty five thousand dollars has to go on your tax return and you're going to be paying perhaps a third of that or roughly eleven thousand dollars in taxes annually. Do you understand that?

A: Yes.

Q: Now, that ... that would be theoretically the high end of that obligation, right?

A: Uh huh.

Q: And so theoretically, over the next hundred and twenty one months or ten years and one month, you're going to receive in actual cash dollars assuming

the highest tax burden to you of about two hundred and forty thousand dollars, but it's going to be guaranteed and by guaranteed, he will not be able to discharge it in bankruptcy. All that has been represented to you. Is that correct?

A: Yes.

Q: And so basically you're receiving a Buick worth eight, ten thousand dollars, your furniture and household goods which perhaps is worth five thousand dollars and an additional three hundred and fifty thousand dollars.

A: No.

Q: Do you understand that if we'd had a full blown trial today ... that the Judge may give you more than what we are talking about? I mean theoretically ... you ... you strike that. You understand, do you not, that alimony is only ... in Indiana is only done by agreement? You can't ... the Judge can't order alimony unless it's done by agreement. Do you understand that?

A: Yes.

Q: Do you understand that theoretically the Judge could have given you a money judgment close to four hundred thousand dollars instead of three hundred and fifty thousand dollars, but then you wouldn't have any guarantee of payment?

A: Yes

Q: All of those kinds of things have been the types of things that I with you have helped to analyze where we're going in this case and how we're going to resolve it. Is that right?

A: Yes.

Appellant's App. 80–82.

The agreement itself and the testimony about the agreement provide evidence of the parties' intent. Cynthia gave up the opportunity to receive more of her share of the marital estate through a money judgment, in exchange for the guarantee that she would receive a substantial, though lesser, amount of the marital estate.

Curtis' arguments concerning tax and bankruptcy consequences are unpersuasive.

The trial court erred by granting Curtis' Verified Petition to Revoke Maintenance and Child Support. The periodic payments to Cynthia were property settlement payments.

*II. The Effect of Reconciliation*

After terminating the periodic payments Curtis was making to Cynthia by characterizing them as spousal maintenance, the trial court further found that Curtis' obligation for that spousal maintenance terminated when they remarried on October 14, 2000. Cynthia claims that regardless of how one characterizes the payments, as spousal maintenance or property settlement, the trial court erred by finding that the obligation automatically was terminated upon Cynthia's remarriage.

We have already concluded above that the agreement at issue is a property settlement. Therefore, the question is whether the parties' subsequent reconciliation automatically terminated the agreement. This is an issue of first impression in Indiana. However, other jurisdictions have addressed this issue. 24A Am.Jur.2d *Divorce and Separation* § 1142 (1998) discusses this topic as follows:

Where the parties execute a true property settlement, as distinguished from a separation agreement, and they thereafter become reconciled and resume cohabitation, one view is that the agreement is not thereby terminated; or, stated another way, reconciliation and resumption of cohabitation do not alone establish the termination of a true property settlement in the absence of the

parties' expressed intent that they may do so. (Footnotes omitted).

35 A.L.R.2d 707, 719–20 § 5 (1954) includes the following annotation:

It has been said that the question whether a property settlement is avoided by or upon a reconciliation and resumption of cohabitation depends upon the intention of the parties ... But the broad statement that the question whether the settlement survives a reconciliation depends upon the intention of the parties may sometimes be misleading. The true rule concerning the effect of intention seems to be that the settlement survives a reconciliation unless the court can find an intention that it shall not survive ... Therefore, where it is proved that the parties became reconciled and resumed cohabitation, but there is no further evidence on intention, the settlement continues in force. (Citations omitted).

■ We believe that these references state the proper approach to be used in situations such as in the case at bar. We hold that property settlement agreements are not automatically terminated by the subsequent reconciliation of the parties absent clear proof the parties so agreed or intended.

■ In the present case, it was error for the trial court to order the automatic termination of payments upon the parties' remarriage. We believe the record is clear that the parties never agreed to termination or mutually intended for the reconciliation to terminate the property settlement payments.

In support of our conclusion we cite the following evidence presented to the trial court. During the hearing on the petition to revoke spousal maintenance and child support, Curtis testified as follows about their post-divorce relationship:

Q: About when in '97 do you ... do you think that you got back together [dating] full time?

A: It was early in the summer.

Q: Okay now had you ... from the time that this divorce decree was entered in October of '95 and the time that you back together in '97, were you making the payments that were laid out in that ...

A: Yes I was.

Q: Decree? How about after that period of time when you got together full time in 1997, did you continue those payments?

A: I would get delinquent on some payments, but would get caught up again. In my contracting business my money is very sporadic.

Q: So are you saying then that you did stay current, or you might have gotten behind.

A: I attempted to stay current.

\* \* \*

Q: Now, during the period of time from '97 when you got back together full time until you married in October of 2000, did you make these ... the payments during that time?

A: Well Cindy set up an account and she had ... she took all of my income in to her account and dispersed it for me. She paid my bills for me and she paid her bills out of that same money.

\* \* \*

Q: And those revenues would go into her personal banking account?

A: Yes.

\* \* \*

Q: And did it continue after that after the remarriage?

A: Sure, absolutely.

\* \* \*

Q: Now, can you say here today that there was an agreement between you two that these payments were not going to need to be formally paid during that period of time?

A: Yeah, we talked about it and I even mentioned one time going back to Court to get it resolved and she became very angry and it was left at that. It was never mentioned again.

Tr. 83–85.

From this testimony we can deduce that there was no agreement or intention on Curtis and Cynthia's part to terminate the payments upon their reconciliation. We can only conclude that the payments survived the parties' reconciliation.

## CONCLUSION

The trial court erred by finding that the agreement entered into between the parties was in the nature of spousal maintenance. The terms of the agreement mirror the factors we have concluded indicate a property settlement. Therefore, we reverse the trial court on this issue. Further, we reverse the trial court's finding that the payments terminated automatically upon the parties' remarriage. The evidence clearly established that the parties neither agreed nor intended for the settlement to terminate; therefore, it survived their reconciliation and remarriage.

Reversed.

FRIEDLANDER and SHARPNACK, JJ., concur.