**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**DAVINA L. CURRY**
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**MICHAEL A. KSENAK**
Martinsville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MELISSA KRODEL, | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 55A01-1201-DR-34 |
| | ) | |
| DOUGLAS KRODEL, | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE MORGAN CIRCUIT COURT
The Honorable Matthew G. Hanson, Judge
Cause No. 55C01-1011-DR-1031

**October 26, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

Appellant-Respondent, Melissa Krodel (Mother), appeals the trial court's award of physical and legal custody of the minor children to Appellee-Petitioner, Douglas Krodel (Father).

We affirm.

ISSUES

Mother raises four issues on appeal, which we consolidate and restate as the following two issues:

(1) Whether the trial court abused its discretion when it applied Ind. Code § 31-17-2-8 to determine the custody of the minor children; and

(2) Whether the trial court abused its discretion when it awarded Father attorney fees after finding Mother in contempt for interfering with Father's parenting time and right of first refusal.

On Cross-Appeal, Father raises one issue, which we restate as: Whether Father should be awarded appellate attorney fees pursuant to Ind. Appellate Rule 66(E).

FACTS AND PROCEDURAL HISTORY

Father and Mother were married on January 8, 1994. Prior to the marriage, Mother and Father became the parents of a daughter, M.N.K., born on October 13, 1992.[1] During the marriage, two more children were born: a daughter, M.D.K., born on October 22, 1997 and a son, M.C.K., born on September 8, 2000 (collectively, the minor

---

[1] The trial court's Order emancipated M.N.K.. The parties do not appeal this emancipation determination; they solely appeal the custody determination of the two minor children.

children). Mother and Father separated in October of 2008 and on January 13, 2009, Father filed a verified petition for dissolution of marriage. On March 18, 2009, the trial court issued its provisional order, awarding the parties joint legal custody of the children, with Mother having sole physical custody and Father having parenting time pursuant to the Indiana Parenting Time Guidelines.

On December 20, 2010, the trial court entered the Decree of Dissolution of Marriage, dissolving the marriage but keeping all provisional orders in effect pending a hearing on remaining issues. The trial court conducted hearings on the custody determination and Father's motion for contempt on August 4, 2011, September 12, 2011, October 3 and 4, 2011, December 3 and 4, 2011 and January 3, 2012. On January 17, 2012, the trial court issued its Order, containing 200 findings detailed over nineteen pages and providing, in pertinent part,

> 10) The [M]other wants the children to live in her physical custody and have visitations with the [F]ather.
> 11) The [F]ather wants the children to live in his physical custody and have visitations with the [M]other.
> 12) Third, the court spoke with both of the children individually in chambers and their wishes shall be considered appropriate.
> * * *
> 14) Fourth is the interaction of the children with various persons in their lives.
> * * *
> 19) Since the very beginning of this case, the [M]other has taken every step conceivable to try and interfere with the [Father's] rights to see the children and to affect how the children see their [F]ather and his new wife, thereby strongly affecting her interaction and interrelationship with the children. Those events affecting the relationship are detailed hereafter.
> * * *
> 22) That in April of 2010 the [M]other filed a Protective Order [PO] against the Father. After review of the file, there was no particular incident of importance wherein this order should have been granted in the first place

and this court is aware that it is practice to grant PO's immediately ex parte and have a hearing thereafter when these are filed.

23) That on June 7, 2010, there was an incident at a Perry Meridian basketball game wherein essentially the [M]other had the [F]ather arrested in front of the children for violating the protective order.

24) That the maternal grandparents created a scene after [F]ather was escorted out of the game as the maternal grandfather began telling others in attendance what a good [M]other the children had, what a low life the [F]ather was, how he never paid the bills and did not take care of the kids.

25) The maternal grandmother then came up, began reciting the same information to the crowd and seemed "irritated that no one was listening to him" and that "he was telling the truth." As people in the crowd began telling the grandparents this was not the time and place to be saying things, the grandmother attempted to strike one of the patrons that was trying to get the grandparents to stop saying what they were saying.

26) The [c]ourt believes the testimony of the third party witness that described the scene in detail and it is noted that [M.D.K.] was present during all of this altercation and began crying on the court.

27) That this entire event at the gym relates as to the relationship of the [M]other with her children in that she had the [F]ather arrested in front of her children and then did not try to stop her parents from making a spectacle for at least one of the children to observe. For the record, this event took place almost nine months after the parties separated and six months after the divorce was filed.

* * *

30) That on June 18, 2010 there was a Temporary Agreement and Order Awarding Father Make-Up Time stating that the [F]ather had not seen the children since March 19, 2010.

* * *

32) That on August 9, 2010, an Amended Provisional Order was agreed to by the parties, including language that the Indiana Parenting Time Guidelines (IPTG) were to be followed and ordered the [M]other to remove a block she had placed on [M.D.K.'s] phone.

* * *

34) That almost immediately a Motion to Modify Custody was filed setting forth that the [M]other had been in a physical altercation with the oldest child and that the younger children had missed between 22 and 30 days of school.

* * *

42) The [M]other testified she "misread" the IPTG and essentially agreed with the schedule that was proposed weeks before the hearing. The [Mother] was threatened with jail time for a failure to follow the visitation

dates set forth and was further ordered to follow the right of first refusal and not let the children dictate visitation dates and times.

43) The evidence also made it clear the [Mother] was stating in texts and emails that the children could decide when and if they wanted to visit their [F]ather.

44) That on August 23, 2011, a Motion to Appear and Show Cause was filed alleging that the [M]other had again denied and/or changed parenting time.

45) That [M]other showed up early to pick up the children, after self-modifying the parenting time of [F]ather, tracked the [F]ather to a local Chuck E Cheese restaurant and called the police to intervene. Both children were present to see the police arrive at the restaurant.

46) That again the maternal grandparents were present at this Chuck E Cheese event.

* * *

49) The court held extensive discussions off and on the record with all of the parties on how the [Right of First Refusal] [ROFR] was to be applied, even citing the most recent case law and ensuring on the record that the [M]other understood how the ROFR worked.

* * *

51) That through emails and texts, it was clear the [Mother] was purposely and intentionally not permitting the ROFR and thereby not permitting her children to have visits they should have had. This continued even after this hearing.

52) That on October 7, 2011, the [c]ourt found the [Mother] in contempt of missed/interference with visits and ordered her to serve time in jail.

53) That on December 29, 2011, the [F]ather filed another Motion for Order to Appear and Show Cause, essentially alleging a violation of the ROFR by the [M]other on the two (2) weekends she served in jail for the previous contempt.

54) That at the January hearing, [Mother] testified that as SHE read the case law the court had provided her at the prior hearing, she had the right to leave the children with her boyfriend at her residence since he was an "appropriate adult."

55) That the previous discussion held with the attorneys and parties had therefore been ignored because of her "new" reading of the law.

56) That [M]other's arguments before the court in January 2012 were the exact same ones made by her counsel BEFORE the court told her at the previous hearing and ordered her in writing how the ROFR takes place.

* * *

59) That in addition to all of the violations of visitation orders in this case, the [Mother] has also taken a course to poison her children against the

5

[F]ather and his new wife, Carrie, thereby affecting her interrelationship with the children.

* * *

62) That the [M]other has sent dozens of letters to the children in their backpacks when they go to the [F]ather's for visits.

63) That these letters are so obviously slanted at making jabs at [F]ather and his new wife that it offends any logical sensibilities that they are for any other purpose.

64) That the court reviewed all of the letters and finds that things such as "I know how you feel about things there but there is nothing I can do about it right now," and "You're gonna be 13 next week – so then you can decide," "I'm not writing a whole lot because of Carrie not keeping her nose out of our business," "when Carrie and Nathan get on your nerves – block them out and think of me!" "remember what everyone has told you about Nathan & Carrie," "I know how this is hard on you, but you can call me," "I miss you so much," "ignore Carrie.  Hopefully he will keep her away and spend time with just you guys!" along with dozens of other quotes that could be included are simply wrong and almost criminal in how [M]other is poisoning the children against their dad and his new wife.

* * *

69) In one particular letter, the [Mother] states "They will NEVER accept Carrie and I will (and so will everyone else) constantly remind them WHY you left us and who was behind your leaving!! . . . I HATE CARRIE AND THE KIDS DO AND WILL TOO!! SHE BETTER NEVER SHOW HER FACE AROUND ME – THAT'S ALL I GOT TO SAY!! SHE BETTER NEVER SHOW UP AT A GAME OR ANY OF OUR KIDS ACTIVITIES!! SHE [IS] NOT WELCOME AND NEVER WILL BE!!  I have already told the kids that you are to lie and weezle your way into making them think she was not involved."

70) These statements, along with others made throughout this case, make it clear that the [M]other created and continues to foster a hostile and negative impression of the [Father's] new wife to the children both directly and indirectly.

* * *

72) The children seem to have a sufficiently good relationship with their [F]ather in this case.

* * *

76) That in fact, the relationship [between Mother and Father during the marriage] was seemingly one where [F]ather brought home the money and [M]other took care of the children.

* * *

80) The court never really heard direct evidence about any toxic or inappropriate relationship that the [F]ather had with the two children at issue in this case.

* * *

85) There are several other persons that may significantly affect the best interest of the children in this case.

86) That the [M]other's parents have been negatively involved in several aspects of this case as described above.

* * *

92) That during a June hearing in this case, the maternal grandmother was heard making derogatory statements to the [F]ather and his new wife and on the stand she admitted to stating "I always wanted to see what two assholes looked like when they get married."

93) That her saying something wrong was later verified on a Facebook page where she realized that she said something wrong. Grandmother tried to claim she did not recall making that statement on Facebook and further that she did not even understand Facebook. This court finds this statement and backing down from a statement she obviously made as another attempt to cover up her negative actions in this case.

* * *

96) That at the same June hearing, the maternal grandfather apparently was overheard calling the [F]ather and/or Carrie a "whore" and once on the stand, he tried to downplay this statement and alleged he called the [F]ather a "whore" and not Carrie.

97) That on the stand grandfather was asked if he called Carrie a "slut" some time in the recent past. He denied calling her that but continued testifying under his breath that "if the shoe fits."

* * *

117) Also as discussed above under the [M]other's interrelationship with the children, the constant references to the "whore" and statements that "Carrie will never be accepted by the children," poison all of the negative testimony offered about Carrie, by [M]other in this case.

118) Simply, [M]other's hatred is so great that most of her stories and statements regarding Carrie must be given little to no weight.

119) That there was no real evidence, other than the interference in communications that the [F]ather claimed to have handled, that Carrie is a bad influence on the children in this matter.

* * *

122) That the court must consider the children's adjustment to whichever home the children would be living in and examine the homes in question.

* * *

125) That [F]ather raised the issue of poor attendance that the children had while they were under the care and custody of the [M]other.

7

* * *

132) That the evidence is clear from 2008 through 2010 school years the [M]other was neglectful in ensuring school attendance of her children.

133) That as this case got moving and issues regarding custody came into light, [M]other apparently realized the issues of education were problematic and their attendance improved.

* * *

137) That there was extensive testimony about animals and filth in the marital residence after the [Father] left. That there apparently was one animal that tore up one room and [an]other that may have relieved itself in the home.

* * *

144) Next is the issue of the mental and physical health of all individuals involved.

145) First, the [M]other went to great lengths to attack the [Father's] mental and emotional health.

146) It is apparent that during the marriage the [Father] cheated on the [Mother], however this has little if anything to do with the children, and only goes to show a lack of character and judgment.

147) Second, the [F]ather had an internet relationship with a woman that turned out to be the [M]other's cousin wherein [F]ather sent a naked picture of himself to the cousin.

148) That [F]ather alleges this relationship was staged by the cousin to get him in trouble and it would seem evidently clear that this claim has validity in light of the fact that all of the messaging back and forth as well as the picture were provided to the [M]other in this case.

* * *

150) Bad judgment is one thing. Bad judgment spurred on by a plan set in motion by the [M]other is another. Still, it was bad judgment to send such a photo and weighs in only a minor fashion when determining the [F]ather's mental and physical health.

* * *

154 [] the court must consider the former excessive drinking of the Father in this case, albeit several years ago at a time when the parties were married.

* * *

161) The [M]other simply will not and has not let go of her pain and has persisted since the very first moment to poison her children against their [F]ather and his new wife.

162) That the actions from the first six months to one year after the separation might be somewhat excusable or even understandable, but after so much time, it must be concluded that [M]other has a serious mental

8

inability to move on with her life and she is dragging anyone and everyone down around her.

163) That [M]other had been held in contempt recently for her failures in following simple orders and then, while in jail, violates the exact same order that was just discussed extensively with her just a few short weeks before.

164) That [M]other's constant claims of "she didn't read something correctly" or "didn't understand" or that the way "she reads the law" is like the boy that keeps crying wolf. After a time her claims of ignorance or misunderstandings are simply seen as lies and she cannot be believed.

* * *

171) In simple words, the [M]other along with help from her parents, have alienated the children in this case from their [F]ather at every opportunity they have been given.

172) In all the years on the bench, the court has never seen such a systematic and intentional series of events to drive a wedge between children and the [F]ather and the court has been greatly disturbed by the actions of the [M]other throughout.

* * *

176) However, if custody was granted today with the [M]other, there is little doubt any hope of a normal relationship with the [F]ather would be gone and the [M]other would continue to alienate the children from their [F]ather at every chance as she has done over the past two years.

177) Weighing all of the factors as required by the statute, and giving particular weight to the interrelationship/interaction of the children with their [M]other and the [M]other's mental health, there can be only one clear decision that is in the best interests of the children and that is that they are placed in the physical custody of their [F]ather.

178) That further, since these parties cannot get along at all over the past two years, the [F]ather shall have full legal custody as well.

179) That the [M]other shall have parenting time according to the Indiana Parenting Time Guidelines.

180) That the Right of First Refusal will not apply.

(Appellant's App. pp. 135-51).

Mother now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

APPEAL

I. *Standard of Review*

9

When the trial court enters findings *sua sponte*, the specific findings control only as to the issues they cover, while a general judgment standard applies to any issue upon which the court has not found. *Brinkmann v. Brinkmann*, 772 N.E.2d 441, 444 (Ind. Ct. App. 2002). The specific findings will not be set aside unless they are clearly erroneous, and we will affirm the general judgment on any legal theory supported by the evidence. *Hanson v. Spolnik*, 685 N.E.2d 71, 76 (Ind. Ct. App. 1997), *trans. denied*. A finding is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id.* at 76-77. In reviewing the trial court's findings, we neither reweigh the evidence nor judge the credibility of the witnesses. *Id.* at 77. Rather, we consider only the evidence and reasonable inferences drawn therefrom that support the findings. *Id.*

## II. *Determination of Custody*

Although this case has been ongoing for several years and resulted in numerous hearings and countless provisional orders, we are asked to review the trial court's first determination of custody of the minor children and not, as mistakenly mentioned in Mother's brief, a modification of previously established custody. In an initial custody determination, both parents are presumed equally entitled to custody. *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002). In evaluating a parent's capability to manage the children's custody, a trial court should be guided by Indiana Code section 31-17-2-8, which provides:

> The court shall determine custody and enter a custody order in accordance with the best interests of the child. In determining the best interests of the child, there is no presumption favoring either parent. The court shall consider all relevant factors, including the following:

10

(1) The age and sex of the child.

(2) The wishes of the child's parent or parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:
    (A) the child's parent or parents;
    (B) the child's sibling; and
    (C) any other person who may significantly affect the child's best interests.

(5) The child's adjustment to the child's:
    (A) home;
    (B) school; and
    (C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 8.5(c) of this chapter.

A trial court's custody determination is afforded considerable deference as it is the trial court that sees the parties, observes their conduct and demeanor, and hears their testimony. *Trost-Steffen v. Steffen*, 772 N.E.2d 500, 509 (Ind. Ct. App. 2002), *trans. denied*. Thus, on review, we will not reweigh the evidence, judge the credibility of witnesses, or substitute our judgment for that of the trial court. *Id*. We will reverse the trial court's custody determination only if it is clearly against the logic and effect of the facts and the circumstances or the reasonable inferences drawn therefrom. *Id*.

Mother now contests the trial court's award of the minor children's legal and physical custody to Father. Without addressing any specific findings, Mother introduces

11

very generalized statements to support her allegation that the statutory factors enumerated in I.C. § 31-17-2-8 weigh in her favor and mandate a "change of custody" of the children to her. (*See* Appellate Br. p. 13). In essence ignoring her own actions during the dissolution proceedings, Mother focuses on Father's activities during the marriage, the actions of Mother's parents during the dissolution proceedings, and Mother's relationship—or lack thereof—with Carrie and asserts that none of these interactions affected the minor children's wellbeing. Pointing to the minor children's affection for Father during their visits, she confidently alleges that "[a]lthough the dissolution has been difficult, the minor children have a good relationship with Father, which has not suffered as a result of Mother's, or anyone else's opinion or feelings about Father and Father's wife, Carrie." (Appellant's Br. p. 13). We are not persuaded.

In two hundred separate findings, the trial court meticulously and thoughtfully addressed the evidence presented during the hearing as it related to each statutory element. The trial court took into account the statutory requirement of the children's interaction and interrelationship with their parents and "any other person who may significantly affect the child's best interest." *See* I.C. § 31-17-2-8(4)(C). Pursuant to this provision, the trial court appropriately evaluated the interaction of the parents, the maternal grandparents, and Carrie with the minor children and the impact of these individuals' actions on the lives of M.D.K. and M.C.K.

The hostility between the parents is plain, and even a cursory glance at the voluminous record overwhelmingly supports the conclusion that the parents have made child-rearing a recurring legal battle. While we acknowledge that neither parent is

12

without blame, the lack of cooperation and communication between these parents reaches a level of distrust and vindictiveness that we have rarely encountered before. Under the facts before it, the trial court was placed in the unenviable position of choosing one parent over the other because of the parents' inability to isolate their personal conflicts from their role as a parent and to hide the resentment and rancor they harbor. In light of this level of parental incapability to share authority and responsibility over the minor children, we cannot say the trial court's award of custody of the minor children to Father was clearly erroneous. We conclude that the evidence amply supports the trial court's determination of custody.

### III. *Award of Attorney Fees*

Mother contends that the trial court erred when it ordered her to pay a portion of Father's attorney fees because she did not knowingly, willfully, or intentionally disobey the trial court's orders on Father's parenting time and the right of first refusal.[2] Mother appeals the imposition of two contempt findings, each ordering her to pay Father's attorney fees in the amount of $500. First, on June 14, 2011, after a hearing on Father's petition for contempt, the trial court established the parties' summer visitation schedule and found that Mother owed Father an attorney fee of $500 "for her position that the children control visitations, for not allowing the visitations as set out, nor following the dictates in setting up summer visits if she objects and for going through the hearing today when she in fact agreed to the remedy [Father] was seeking." (Appellant's App. p. 102).

---

[2] Although the trial court imposed jail time as well as payment of attorney fees to punish Mother's contempt for the court, on appeal Mother only disputes the imposition of attorney fees.

Second, on October 7, 2011, after an evidentiary hearing, the trial court held Mother in contempt for her failure to comply with the right of first refusal and sentenced Mother to four actual days of jail time and ordered her to pay Father $500 in attorney fees.

The Indiana Appellate Rules require each party seeking an appeal to file its notice of appeal within thirty days after the entry of a final judgment. *See* Ind. Appellate Rule 9(A). Failure to file an appeal in a timely manner is a jurisdictional failure requiring dismissal of the appeal. *Jennings v. Davis*, 634 N.E.2d 810, 810 (Ind. Ct. App. 1994). Under Indiana law, a contempt citation becomes a final appealable order when the court attaches and punishes the defendant by fine or punishment. *Bayless v. Bayless*, 580 N.E.2d 962, 964 (Ind. Ct. App. 1991), *trans. denied*. In addition, a party has an automatic right to appeal an interlocutory order requiring the payment of money. *See* Ind. Appellate Rule 14. Here, after the trial court awarded Father attorney fees for Mother's contempt, Mother failed to timely file a notice of appeal within thirty days of the trial court's order. Therefore, we cannot now consider the trial court's contempt orders.

CROSS-APPEAL

On cross-appeal, Father requests this court to award him appellate attorney fees pursuant to Indiana Appellate Rule 66(E), claiming that Mother's appeal was undertaken in bad faith. Indiana Appellate Rule 66(E) provides, in pertinent part, that we "may assess damages if an appeal . . . is frivolous or in bad faith. Damages shall be in the [c]ourt's discretion and may include attorney's fees." Our discretion to award attorney fees under this rule is limited, however, to instances when an appeal is permeated with

14

meritlessness, bad faith, frivolity, harassment, vexatiousness, or purpose of delay. *Thacker v. Wentzel*, 797 N.E.2d 342, 346 (Ind. Ct. App. 2003). Additionally, while Indiana Appellate Rule 66(E) provides this court with discretionary authority to award damages on appeal, we must use extreme restraint when exercising this power because of the potential chilling effect upon the exercise of the right to appeal. *Id*. A strong showing is required to justify an award of appellate damages and the sanction is not imposed to punish mere lack of merit but something more egregious. *Harness v. Schmitt*, 924 N.E.2d 162, 168 (Ind. Ct. App. 2010).

Indiana appellate courts have formally categorized claims for appellate attorney fees into substantive and procedural bad faith claims. *Id*. To prevail on a substantive bad faith claim, the party must show that the appellant's contentions and arguments are utterly devoid of all plausibility. *Id*. Substantive bad faith implies the conscious doing of a wrong because of dishonest purpose or moral obliquity. *In Re Estate of Carnes*, 866 N.E.2d 260, 269 (Ind. Ct. App. 2007). Procedural bad faith, on the other hand, occurs when a party flagrantly disregards the form and content requirements of the rules of appellate procedure, omits and misstates relevant facts appearing in the record, and files briefs written in a manner calculated to require the maximum expenditure of time both by the opposing party and the reviewing court. *Harness*, 924 N.E.2d at 168.

In his request for appellate attorney fees, Father contends that Mother's appellate brief contains deficiencies with respect to both prongs of the bad faith requirement. Claiming procedural bad faith, Father points to Mother's Motion for Leave to Amend [Appellate] Brief, which was granted by this court, as an admission of procedural

violations of the Rules of Appellate Procedure. Additionally, Father asserts that Mother failed to include a chronological case summary of the trial court where the divorce proceeding was initially docketed, Mother included argumentative facts, and misrepresented testimony.

Mindful of our duty to use great restraint in determining the appropriateness of appellate attorney fees and although it cannot be denied that Mother failed to comply with our appellate rules of procedure, we cannot say that the procedural defects are so egregious that they permeated her entire brief and precluded a review of her allegations.

Turning to the substantive bad faith claim, Father focuses on Mother's mischaracterization of the trial court's initial custody determination issued January 17, 2012 as an order to modify child custody. While this particular characterization is devoid of plausibility, Mother also discussed the correct statutory requirements of I.C. § 31-17-2-8 in her appellate brief. Therefore, we conclude that Mother's appeal possesses sufficient merit to withstand an award of attorney fees.

## CONCLUSION

Based on the foregoing, we hold that the trial court appropriately applied I.C. § 31-17-2-8 in awarding custody of the minor children to Father. Because Mother failed to timely appeal, we are without jurisdiction to review the trial court's orders on contempt. On Cross-Appeal, we deny Father's request for appellate attorney fees pursuant to Ind. Appellate Rule 66(E).

Affirmed.

BAILEY, J. and CRONE, J. concur