## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this
Memorandum Decision shall not be regarded as
precedent or cited before any court except for the
purpose of establishing the defense of res judicata,
collateral estoppel, or the law of the case.

FILED

Aug 11 2016, 7:39 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Vincent M. Campiti
Nemeth Feeney & Masters, P.C.
South Bend, Indiana

ATTORNEY FOR APPELLEE

Debra Voltz-Miller
South Bend, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of Paternity of
N.S.,

K.H.,

*Appellant-Petitioner,*

v.

D.S.,

*Appellee-Respondent.*

August 11, 2016

Court of Appeals Cause No.
71A03-1512-JP-2172

Appeal from the St. Joseph Probate
Court

The Honorable James N. Fox, Judge

Cause No. 71J01-0101-JP-33

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Petitioner, K.H. (Mother), appeals the trial court's Order denying her motion for modification of custody of her minor child, N.S. (Child), in favor of Appellee-Respondent, D.S. (Father).

We affirm.

## ISSUE

Mother raises one issue on appeal, which we restate as: Whether the trial court abused its discretion by denying Mother's motion to modify child custody.

## FACTS AND PROCEDURAL HISTORY

The Child was born on January 15, 2001. On April 30, 2001, a petition to establish paternity was filed, and the trial court entered an order for genetic testing. On August 7, 2001, Father's paternity was established with respect to the Child, and Mother was awarded primary physical custody of the Child. Following a petition to modify custody by Father in 2008, the trial court found that there were substantial changes in circumstances which made the existing custody arrangement unreasonable. Specifically, the CCS entry dated February 14, 2008, stated that Mother had interfered with Father's make-up visitation scheduled on the weekends of January 4, 2008 and January 11, 2008. It further noted that in an effort to thwart Father's make-up parenting time, on December 20, 2007, Mother contacted the Kokomo Police Department and filed a false report which alleged that Father had placed the Child in his crawl space. A search warrant was issued and officers were dispatched to Father's home;

however, they found no evidence to suggest that Father had placed the Child in the crawl space. Also, Mother had denied Father visitation on January 25, 2008, and on February 8, 2008. Lastly, there was a notation that Mother's mental state had deteriorated to the point that it was dangerous for the Child to remain in her care. Accordingly, the trial court modified the custody arrangement by granting Father primary custody of the Child. At the time that order was entered, the Child was seven years old.

[5] On April 11, 2014, Mother filed a petition to modify custody. Mother purported that there was continued conflict between Father and the Child. Mother also claimed that the police had been called to Father's home because Father could not get the Child to take a shower. In addition, Mother asserted that by the end of the Child's summer, the Child, who was living with her at the time, exhibited significant emotional upheaval since he had to continue living with Father. In addition, Mother stated that the Child was older and he desired to live with her. Also, Mother claimed that the Child had to leave his home every night and sleep elsewhere since Father had to work at night.

[6] On August 18, 2014, the trial court issued an order appointing Racheal Friend as *Guardian Ad Litem* (GAL) for the Child. On October 17, 2014, the GAL filed a court-ordered psychological exam with respect to the Child. On April 6, 2015, the GAL filed her findings and attached the psychological exam conducted by Robert McClurg, Ph.D. (Dr. McClurg). On April 17, 2015, the trial court heard Mother's petition to modify custody. The trial court heard testimony from the GAL, and from the parties as well.

[7] Mother testified that Father physically abused the Child on at least two instances. Specifically, Mother alleged that she saw some bruising on the Child's "upper chest area" and that Child had informed him that Father had "grabbed him by the neck, [thrown] him down on the ground, and then picked him up [by] his shirt and that's how he got the marks . . . . In fact, I took a picture of them." (Tr. p. 55). Mother stated that she reported the incident to the GAL. With regard to the second incident, Mother claimed that Father had twisted the Child's "nipples and it left another mark." (Tr. p. 56). Mother indicated that she saw marks because the Child liked walking around without his shirt. Mother stated that she also reported that incident to the GAL.

[8] Mother also spoke about Father's inability to communicate with her regarding the Child's summer-time parenting time schedule. As an example, Mother stated that during a certain drop-off, she attempted to give Father her summer schedule, but Father would not roll down his windows or accept the document from her. Mother claimed that she asked the Child to read it out loud to Father.

[9] In addition, Mother talked of the Child's emotional well-being. At the time of the trial, the Child was fourteen-years-old. Mother stated that the Child was more mature, and could communicate more effectively. Mother alleged that in April of 2014, she observed emotional changes with the Child. Mother asserted the Child's emotional behaviors were not present before. Specifically, Mother stated that every Wednesday, after Father dropped off the Child to her for her mid-week parenting time, the Child would be in low spirits. Mother stated that

she would take the Child out for dinner, and afterwards, the Child would resume being his normal happy self. Furthermore, Mother claimed that the interaction between the Child and Father was not at its best and that there was tension between the two. Specifically, Mother testified that Father barely spoke to the Child in the evening and that the two would have dinner in silence. Mother also claimed that she did not experience any behavioral problems at her house that Father encountered at his home with the Child. According to Mother, due to the emotional turmoil that the Child experienced while residing with Father, Mother alleged that the Child would at times fall violently sick. Also, Mother claimed that in 2014, Father worked at night and the Child was required to sleep elsewhere.

[10] With regard to Mother's employment, Mother testified that she received an associate of science and nursing in May 2014. Mother stated that she had been in school for the past four years and that she remained unemployed throughout that time. Even after having graduated from school, Mother claimed that her employment was delayed since she contracted pneumonia. At the time of this evidentiary hearing, Mother was studying for her nursing board exams and she testified that she had a job interview scheduled and would probably secure employment as a nurse in the next thirty to sixty days.

[11] Father testified that for the past eleven months, he worked from 10:30 p.m.-7:00 a.m. Father stated that he would drop off the Child either at his father's or sister's house before going to work. On one of those days, as Father was preparing to leave the house for work, Father told the Child to go to the car and

wait there while he turned off the lights. Instead of going to the car, the Child stood in the corner of the doorway, and when Father turned off the lights, he tripped and fell on the Child. Contrary to Mother's claim, no bruising was observed on the Child. As for the incident that involved the police, in May of 2014, the Child had refused to take a shower and Father picked out clothing for the Child. The Child was upset and he informed Father that he would report him to the police liaison the next day at school. Father testified that "I'm the kind of person that let's just call now, why wait until tomorrow." (Tr. p. 42). For that reason, Father handed the Child his cellphone and told him to go ahead and call the police. When the police arrived, they talked to the Child about "incorrigibility" and doing what Father was asking him to do. (Tr. p. 44).

[12] The GAL testified that in her interviews with the Child, the Child stated on multiple occasions that he would rather live with Mother in South Bend, Indiana, than with Father in Kokomo, Indiana. According to the GAL, the Child had an easier relationship with Mother since Mother had a softer parenting style approach as opposed to Father's firmer approach. The GAL further testified that Father's firm and strict parenting style manufactured a lot of anxiety for the Child. The GAL stated that the Child admitted that he at times chose not to do his chores since he wanted to antagonize Father. Because the Child wanted to live with Mother, the GAL noted that the Child was "being defiant in order to get his own way." (Tr. p. 26). According to the GAL, the Child broke down easily when confronted with the possibility that he was going

continue living with Father. With respect to Mother's assertions that Father physically abused the Child on at least two occasions, the GAL interviewed the Department of Child Services (DCS). The GAL testified that Mother's assertions were unsubstantiated. When asked if there was substantial change that would justify modification of custody, the GAL concluded that for the Child's overall emotional health, he was better off living with Mother. In addition, the GAL recommended that it was in the Child's best interest to live with Mother based on the fact that over the course of eight months, while the GAL was involved in the case, the Child had an unwavering strong preference to live with Mother.

[13] At the close of the evidentiary hearing, the trial court directed the parties to file their proposed findings of fact and conclusions of law within twenty-one days. On July 29, 2015, the GAL filed a status update stating that "the GAL wishes to bring to the Court's attention that the Kokomo[] school district begins its new school year in approximately one week. Depending on the court's ruling, [the Child] will be beginning high school in either Kokomo or South Bend. The GAL believes that a court ruling prior to the beginning of school . . . is in the [Child's] best interest." (Appellant's App. p. 62). On August 3, 2015, the trial court entered an Order denying Mother's petition.

[14] Mother now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

We review a trial court's ruling regarding a request for modification of custody for an abuse of discretion. *In re Paternity of J.T.,* 988 N.E.2d 398, 399 (Ind. Ct. App. 2013). We give considerable deference to trial courts in family law matters, recognizing that they often must make "'Solomon-like decisions in complex and sensitive matters'" and that only trial courts are in a position "to see the parties, observe their conduct and demeanor, and hear their testimony . . . ." *Trost-Steffen v. Steffen,* 772 N.E.2d 500, 509 (Ind. Ct. App. 2000) quoting *Speaker v. Speaker*, 759 N.E.2d 1174, 1179 (Ind. Ct. App. 2001)), *trans. denied.* In reviewing a custody modification ruling, we must not reweigh the evidence or assess witness credibility and will only consider the evidence and inferences most favorable to the trial court's judgment. *J.T.,* 988 N.E.2d at 400.

Here, the trial court was requested to enter its findings of fact and conclusions of law with respect to Mother's motion to modify custody. When there is a request for special findings and conclusions thereon, "we may affirm the judgment on any legal theory supported by the findings." *Werner v. Werner*, 946 N.E.2d 1233, 1244 (Ind. Ct. App. 2011). We are obligated not to substitute our judgment for that of the trial court if any evidence or legitimate inferences support the trial court's ruling. *Best v. Best,* 941 N.E.2d 499, 503 (Ind. 2011). In order to reverse a trial court's custody modification ruling, "'it is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by the appellant before there is a basis for

reversal.'" *Id.* (quoting *Kirk v. Kirk,* 770 N.E.2d 304, 307 (Ind. 2002)). "[I]t is particularly difficult for a reviewing court to second-guess a situation that centers on the personalities of two parents battling for control of a child." *Kirk,* 770 N.E.2d at 308.

[17]     Mother argues on appeal that the trial court's decision denying her modification of custody is clearly erroneous.   A court may not modify a child custody order unless the modification is in the best interests of the child, Ind. Code § 31-17-2-21(a)(1), and there is a substantial change in at least one of the following:

> (1) The age and sex of the child.
>
> (2) The wishes of the child's parent or parents.
>
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
>
> (4) The interaction and interrelationship of the child with:
>
> (A) the child's parent or parents;
>
> (B) the child's sibling; and
>
> (C) any other person who may significantly affect the child's best interests.
>
> (5) The child's adjustment to the child's:
>
> (A) home;
>
> (B) school; and
>
> (C) community.
>
> (6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a *[de facto]* custodian . . .

I.C. § 31-17-2-8. We emphasize that a showing of a change in circumstances regarding one or more of the above factors is not enough to warrant a modification of custody; it must also be proven that modification is in the child's best interests. *Joe v. Lebow*, 670 N.E.2d 9, 22-23 (Ind. Ct. App. 1996).

[18] In the Order denying Mother's petition to modify custody, the trial court concluded that the claims of physical abuse by Father were unsubstantial by DCS. In addition, the trial court concluded that the Child was safe with both parents; he was doing well in school; and both parents' families cared for the Child. Although it noted the Child's preference to live with Mother, it concluded that there was no substantial change in the circumstances.

[19] Here, Mother's chief arguments are centered on the fact that the Child intimated his wish to live with her and the breakdown of the Child's relationship with Father. On Mother's first argument, she states that because the Child was fourteen years old at the time of the hearing, Indiana law mandates that his preference be given "more consideration" by the trial court. *See* I.C. § 31-17-2-8(3). Despite her argument, Mother concedes, and correctly notes that "a change in the child's wishes, standing alone, cannot support a change in custody." *Williamson v. Williamson,* 825 N.E.2d 33, 40 (Ind. Ct. App.

2005); *see also In re Marriage of Sutton*, 16 N.E.3d 481, 485 (Ind. Ct. App. 2014). In *Sutton*, we noted that the supposition in *Williamson* to be

> . . . somewhat out of sync with the language and interpretations of our current statute. *See* Ind. Code § 31-17-2-21 ("The court may not modify a child custody order unless . . . there is a substantial change in *one (1) or more* of the factors . . . ") (emphasis added); *In re K.I.*, 903 N.E.2d 453, 460 (Ind. 2009) ("[A] substantial change in any one of the statutory factors will suffice [to support a modification.]"). That said, we are cognizant that there are certain inherent dangers in allowing custody modifications to occur solely at the behest of a child. Suffice it to say, there is a host of potential factors and circumstances that could dictate whether a child's wishes constitute a substantial change in circumstances and whether a modification would be in the best interests of the child where the sole basis for modification is the child's preference.

*In re Marriage of Sutton*, 16 N.E.3d at 486.

[20] At trial, the GAL testified that during her contact with the Child, she observed that the Child had "a steadfast preference for [Mother] and seemed to have some real emotional issues and sort of [] toxic[] dealings" with Father. (Tr. p. 10). The GAL admitted that, at times, the Child chose not to do his chores since he wanted to upset Father. Because the Child wanted to live with Mother, the GAL noted that the Child was "being defiant in order to get his own way." (Tr. p. 26). The GAL's overall opinion was that switching custody with Mother would ease the Child's emotional turmoil and also be in the Child's best interest. In addition, Dr. McClurg's evaluation dated March 5, 2015, which was attached to the GAL report, stated that he interviewed both parties and the Child. Dr. McClurg's impression of the Child was that the

Child had a positive bond with Mother versus a somewhat distant and anxious relationship with Father. Dr. McClurg in addition noted:

> [The Child] basically identified a very positive emotional bond with [M]other versus a somewhat distant, anxious relationship with [] [F]ather. [The Child] seemed to express that he was more comfortable in [Mother's] presence because of more predictability and less intensity. [The Child] also strongly stated that he had an exceptionally positive and close relationship with his maternal grandparents and misses more frequent contact perhaps almost just as much as he does []with [Mother]. In contrast [the Child] describes [Father] as being stricter whereas [Mother] is more "nice". [The Child] feels that [Father] tends to be more physical in his punishment whereas [Mother] uses more talking or consequences in discipline. Also got the sense that [the Child] had more difficulty knowing how to read [F]ather emotionally. [The Child] described what appears to be some sarcastic humor or sarcasm, which [the Child] found very hard to interpret. [The Child] did, however, deny that [Father] ever hit him with a belt and the choke situation appears in his mind to not be clear whether it was intended that way or was truly an accidental trip, falling on top of him and grabbing him around the shoulders in the neck area when he fell on top of him and then pull him back up. [The Child] did also describe a positive relationship with the paternal grandparents.
>
> ****
>
> In my clinical opinion I would close by saying that I do think that [the Child] is basically a very well-adjusted young man outside these issues regarding his parents. I think he is a very sensitive person who worries a lot about others and how they will respond to him. That seems to be what drives the emotionality and the tearfulness that [the GAL] was picking up on and myself observed as well. I do not feel that clinically it is anything specifically that has been egregious that has happened, but rather just an overall difference in response to the personality of [] [F]ather versus [] [M]other and different styles of relationships and different styles of discipline. However, I would recommend that [the

Child] could profit from some ongoing psychological therapy or counseling.

(Appellant's App. pp. 59-60).

[21] All of the above brings us to Mother's primary legal argument, which is that the trial court did not place enough emphasis on the Child's wishes to be in Mother's custody. No one disputes that the Child wanted to live with Mother; however, as discussed in the foregoing, "there are certain inherent dangers in allowing custody modifications to occur solely at the behest of a child." *In re Marriage of Sutton*, 16 N.E.3d at 486. Through the testimonies of Mother, Father, and the GAL, all relevant factors pertaining to the Child's wishes were placed before the trial court. Despite the testimonies of the GAL and Mother that the Child wanted to live with Mother, the evidence presented painted a picture of a child who believed that being defiant would let him get his way— *i.e.*, to live with Mother. Mother admitted that Child had confessed that he, at times, did not do his chores or do what he was asked to do while at Father house. Here, the trial court was called upon to decide which placement would be in the Child's best interest. The evidence strongly suggests that the Child was better placed with Father, as it would provide continuity and stability for the Child.

[22] Not surprisingly, Mother places much emphasis on the GAL's testimony and report, who in her opinion, stated it would be in the Child's best interest for the Child to live with Mother. However, we find that the GAL's testimony is merely one item of evidence for the trial court to consider in reviewing all of the

pertinent factors for modifying custody. A trial court is not required to accept opinions of experts regarding custody. *Clark v. Madden,* 725 N.E.2d 100, 109 (Ind. Ct. App. 2000).

[23] With respect to the Child's emotional well-being, Mother testified that there was a rift between Father and the Child, and that the Child was unhappy about living with Father. Mother asserted that she had observed the Child being in low spirits each time during the mid-week exchange. According to Mother, after dinner and spending time with the Child, the Child would resume his normal happy self. Furthermore, Mother stated that there was increased friction between Father and the Child, and she referenced the incident where the police were called to Father's home when the Child refused to take a shower. In addition, Mother claimed that Father barely spoke to the Child in the evening and that the two would have dinner in silence. Mother also claimed that she did not experience any behavioral problems that Father encountered at his house with the Child. According to Mother, due to the emotional turmoil that the Child experienced while residing with Father, Mother purported that the Child would at times fall sick. Accordingly, Mother stated that it would be in the Child's best interest, based on the above, to start living with her.

[24] We note that some of the relevant factors placed before the trial court are equipoise. Both Mother and Father were loving and good parents. However, both had different parenting styles. Father was stricter, while Mother was more relaxed with her parenting style. The Child had arrived at the doorstep of

adolescence, and we understand that this is not only a physical growth but an emotional growth. The GAL testified that the Child broke down easily when confronted with the possibility that he was going to continue living with Father. However, Dr. McClurg's psychological report indicated that nothing egregious had occurred, but the Child emotions was just a reaction or a response to the difference in Mother's and Father's personality and parenting style. With regard to Mother's claim that Father physically abused the Child, those claims were unsubstantiated by DCS, and the Child denied claims of abuse when questioned by Dr. McClurg.

[25] Mother also argues that the trial court entered erroneous findings with regard to her employment status and that she would have a hard time finding a sitter for the Child while at work. Specifically, the trial court stated that Mother had failed to obtain employment and had not offered any explanation for not obtaining employment. In another finding, the trial court stated that Mother complained about Father leaving the Child overnight with his family; yet, it appeared to the trial court that Mother would also face similar trouble. We agree with Mother that these two findings are erroneous. Mother explained her reasons for being unemployed. The evidence shows that Mother was in school for the past four years, and her employment was delayed after graduation since she contracted pneumonia. At the time of this evidentiary hearing, Mother was studying for her nursing board exams and she testified that she had a job interview scheduled. No evidence was presented that Mother would work at night and that the Child would have to sleep elsewhere at night.

We agree with Mother that the two findings are erroneous based on the record; however, we have held that "even an erroneous finding is not fatal to a trial court's judgment if the remaining valid findings and conclusions support the judgment, rendering the erroneous finding superfluous and harmless as a matter of law." *Curley v. Lake Cnty. Bd. of Elections & Registration*, 896 N.E.2d 24, 32 (Ind. Ct. App. 2008) (quoting *M.K. Plastics Corp. v. Rossi*, 838 N.E .2d 1068, 1074 (Ind. Ct. App. 2005)), *trans. denied*. Here, several of the trial court's remaining, uncontested findings independently support its judgment that primary custody of the Child should remain with Father.

We reiterate that we "shall not set aside the findings or judgment unless clearly erroneous," and "[f]indings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *D.C. v. J.A.C.*, 977 N.E.2d 951, 954 (Ind. 2012). Furthermore, we do not reweigh the evidence or reassess witness credibility. *Id*. In sum, looking only to the evidence and all inferences favorable to the judgment, giving due regard to the opportunity of the trial judge to personally observe the witnesses, and refraining from the substitution of our view for that of the trial court, we find that the evidence is not so lacking as to render the trial court's judgment, denying Mother modification of custody, erroneous.

## CONCLUSION

Based on the foregoing, we conclude that the trial court did not abuse its discretion by denying Mother's petition to modify custody.

Affirmed.

Kirsch, J. and Pyle, J. concur